916 F.2d 134
 59 USLW 2239, 18 Fed.R.Serv.3d 184
 Bobby STOTT; Joseph Register; Lonnie Michael Cayton, on
behalf of themselves and others similarly
situated, Plaintiffs-Appellees,
v.
Howard H. HAWORTH, Individually, Defendant-Appellant,
and
James G. Martin, Individually and in his official capacity
as Governor of the State of North Carolina, et
al., Defendants.
Bobby STOTT; Joseph Register; Lonnie Michael Cayton, on
behalf of themselves and others similarly
situated, Plaintiffs-Appellees,
v.
James G. MARTIN, Individually and in his official capacity
as Governor of the State of North Carolina, et
al., Defendants-Appellants,
and
Howard H. Haworth, Individually; James S. Lofton, In his
official capacity as Secretary of Department of
Administration; Grace J. Rohrer,
Individually, Defendants.
Bobby STOTT; Joseph Register; Lonnie Michael Cayton, on
behalf of themselves and others similarly
situated, Plaintiffs-Appellees,
v.
James T. BROYHILL; David T. Flaherty, Defendants-Appellants,
and
James G. Martin, Individually and in his official capacity
as Governor of the State of North Carolina, et
al., Defendants.
Bobby STOTT; Joseph Register; Lonnie Michael Cayton, on
behalf of themselves and others similarly
situated, Plaintiffs-Appellees,
v.
Howard H. HAWORTH, Individually, Defendant-Appellant,
and
James G. Martin, Individually and in his official capacity
as Governor of the State of North Carolina, et
al., Defendants.
Bobby STOTT; Joseph Register; Lonnie Michael Cayton, on
behalf of themselves and others similarly
situated, Plaintiffs-Appellants,
v.
James G. MARTIN, Individually and in his official capacity
as Governor of the State of North Carolina, et
al., Defendants-Appellees.
Bobby STOTT; Joseph Register; Lonnie Michael Cayton, on
behalf of themselves and others similarly
situated, Plaintiffs-Appellees,
v.
James G. MARTIN, Individually and in his official capacity
as Governor of the State of North Carolina, et
al., Defendants-Appellants.
 Nos. 89-1032, 89-1037, 89-1049 to 89-1052.
 United States Court of Appeals,
Fourth Circuit.
 Argued April 5, 1990.
Decided Oct. 4, 1990.
As Amended Oct. 12, 1990.
As Amended Dec. 20, 1990.
 
 John R. Wester, Robinson, Bradshaw & Hinson, P.A., Charlotte, N.C., argued (David C. Wright, III, Thomas B. Griffith, Robinson, Bradshaw & Hinson, P.A., Charlotte, N.C., Robert B. Byrd, Lawrence D. McMahon, Jr., Sam J. Ervin, IV, Byrd, Byrd, Ervin, Whisnant, McMahon & Ervin, P.A., Morganton, N.C., Arch T. Allen, III, Christopher J. Blake, Moore & Van Allen, Raleigh, N.C., Bynum M. Hunter, Michael A. Gilles, Smith, Helms, Mulliss & Moore, Greensboro, N.C., Lacy H. Thornburg, Atty. Gen., Jean A. Benoy and Isham B. Hudson, Jr., Sr. Deputy Attys. Gen., David Roy Blackwell, James Peeler Smith, Edwin M. Speas, Jr. and Tiare B. Smiley, Sp. Deputy Attys. Gen., Neill S. Fuleihan, Associate Atty. Gen., Sp. Litigation, North Carolina Dept. of Justice, Raleigh, N.C., John J. Burney, Jr., Burney, Burney, Barefoot & Bain, Wilmington, N.C., G. Eugene Boyce, Wallace R. Young, Jr., Womble, Carlyle, Sandridge & Rice, Raleigh, N.C., Wayne P. Huckel, Clarence W. Walker, Lisa Hyman Lane, Kennedy, Covington, Lobdell & Hickman, Charlotte, N.C., John S. Stevens, Elizabeth M. Warren, James W. Williams, Roberts, Stevens & Cogburn, Asheville, N.C., A. Lincoln Sherk, Winston-Salem, N.C., David C. Pishko, Elliot and Pishko, P.A., Winston-Salem, N.C., on brief), for defendants-appellants.
 Melinda Lawrence, Donnell Van Noppen, III, argued (Davison M. Douglas, Martha A. Geer, on brief), Smith, Patterson, Follin, Curtis, James, Harkavy & Lawrence, Raleigh, N.C., for plaintiffs-appellees.
 Before RUSSELL, WIDENER, and MURNAGHAN, Circuit Judges.
 DONALD RUSSELL, Circuit Judge:
 
 
 1
 This controversy arose after the election of James G. Martin as governor of the state of North Carolina. Governor Martin, a Republican, succeeded Governor James M. Hunt, a Democrat. After taking office, Governor Martin and his cabinet officers made numerous personnel changes which resulted, inter alia, in the termination or demotion of government employees that held "exempt" positions as defined by the North Carolina legislature. That statute, the North Carolina State Personnel Act, N.C.G.S. Secs. 126-1 et seq., provides that "no permanent employee subject to [the Act] shall be discharged, suspended or reduced in pay or position except for just cause." N.C.G.S. Sec. 126-35. However, the Act exempts certain employees by its terms and allows the governor to designate as exempt from the provisions of the Act certain other policymaking or decisionmaking employees.[1] Each of the plaintiffs in this cause held an exempt position; that position having been so designated as policymaking or confidential by then Governor Hunt.[2]
 
 
 2
 The named plaintiffs brought individual actions seeking damages and injunctive relief, alleging the violation of certain rights protected by the first amendment when each was discharged from an exempt government position for the sole reason of political affiliation. Named as defendants were the governor, his cabinet members and other state officials. The plaintiffs then moved for class certification of their cause pursuant to the provisions of Fed.R.Civ.P. 23, purporting to represent over 130 North Carolina government employees, holding exempt positions, who were subject to adverse personnel action[3] in violation of both the Personnel Act and their constitutional rights. Specifically, the plaintiffs sought certification of a class defined as those individuals who:
 
 
 3
 (a) at any point during the period from 6 November 1984 through 7 January 1985 occupied a position designated as "exempt" from the State Personnel Act as provided in N.C.Gen.Stat. Sec. 126-5 in one of the nine cabinet departments; and
 
 
 4
 (b) have been or will be terminated, transferred, demoted, or had their resignations or retirements coerced by defendants since the first of November 1984, because of their political affiliation or activities.
 
 
 5
 After a hearing on the matter, the district court certified the class and allowed the plaintiffs to amend their complaint and add nine new defendants.[4]
 
 
 6
 The defendants in turn moved for decertification of the class, recusal of the district judge and summary judgment. The defendants based their motion for summary judgment on alternate grounds: first, that each plaintiff was lawfully subject to discharge for political reasons; and, second, that all damage claims should be dismissed because each of the defendants was clothed with qualified immunity. The district court considered the motion and dismissed the claims of 55 class members but kept alive the claims of another 63 class members. In making its ruling, the court found that 46 of these claimants were absolutely protected from discharge for political reasons. The court deferred ruling on ten class members. In a lengthy opinion, the court noted that a decision as to the appropriateness of summary judgment could not be made without a review of the circumstances surrounding each class member. The court focused its inquiry on the job held by each plaintiff prior to the date of the alleged adverse action, as well as the specific action taken. Lastly, with respect to the defendants' motion for summary judgment, the court granted five defendants' motions, finding them to be immune from prosecution of the cause with respect to certain members of the class. Two defendants were dismissed. 725 F.Supp. 1365.
 
 
 7
 The defendants' motion for recusal was based on the following undisputed facts. During the course of discovery it was noted that Dr. Charles Cook, formerly an employee of the Department of Human Resources, was a member of the class. Discovery also showed that the district judge's wife, Judith M. Britt, had, for a time, worked under the supervision of Dr. Cook. It was further disclosed by the district judge that he had been a patient of Dr. Cook and that the Britt family had, some time in the past, maintained a social affiliation with him.
 
 
 8
 The defendants asserted that because Mrs. Britt had direct knowledge of the facts in the dispute regarding the claim of Dr. Cook and that these facts were central to defending against Dr. Cook's claim, she would be called as a material witness at trial. This, according to the defendants, mandated recusal. The district court, pursuant to 28 U.S.C. Sec. 455[5], reviewed the allegations of the defendants and denied the motion for recusal. The court based its decision upon a finding that Mrs. Britt was not a material witness in this case. The defendants' motion for class decertification was also denied, as the district court found that there was a central issue that predominated and was capable of class resolution. Specifically, the court found that the central issue in this case was whether the Martin administration engaged in a policy and practice of firing state government employees solely because of their political affiliation or activities.
 
 
 9
 Thereafter, the district court certified all orders entered for review by this court. 28 U.S.C. Sec. 1292(b). After consideration of the record before us, we remand this cause of action to the district court with an order to decertify the class. Fed.R.Civ.P. 23(a).
 
 I.
 
 10
 The facts comprising the cause before us are not complicated, yet they are in dispute. Governor Martin is, to this date, only the second Republican voted to the post of governor by the North Carolina electorate in the twentieth century. After winning the 1984 gubernatorial election, Governor Martin formed a transition team to facilitate the change of administration. This team advised the governor about policy matters relating to personnel decisions, assisted in implementing the governor's agenda, reviewed and reported to the governor about the efficiency of the nine governmental departments, and assisted the newly appointed department heads in implementing the governor's policies. Although the actual personnel policy established during the transition period is in dispute, the record reflects that a prime goal of the Martin administration was to cut back on the number of state employees holding exempt positions. In fact, this reduction was an issue during the election campaign, and one that Martin promised he would carry out if elected.
 
 
 11
 The transition team was later replaced by a personnel committee and a special patronage department headed by Wilma Sherrill. The principal task of the committee and Sherrill's group was to review the structure of the government and the efficiency of those who held governmental positions and report to the governor about proposed personnel changes.[6] Although the committee did compile information about the political affiliation and activities including campaign contributions of persons in existing positions as well as those applying for governmental positions, it steadfastly denies that any employee was subject to an adverse personnel decision based solely on partisan political grounds other than those employees for which political affiliation is an appropriate requirement.
 
 
 12
 It is clear that both the facts and the law guiding the disposal of this action require judicial investigation into the individual claims of each plaintiff. It is for this reason that we now remand for decertification and order that each claimant be allowed to move forward with his or her claim individually and without prejudice.
 
 II.
 
 13
 Questions regarding the certification of a class action are left to the sound discretion of the district court and any such decision by the district court will only be reversed upon a showing of abuse of that discretion. See Cox v. American Cast Iron Pipe Co., 784 F.2d 1546, 1553 (11th Cir.1986). However, an order certifying a class must be reversed if it becomes apparent, at any time during the pendency of the proceeding, that class treatment of the action is inappropriate. Stastny v. Southern Bell Telephone & Telegraph, 628 F.2d 267, 273-76 (4th Cir.1980). We believe that in the cause now before us, where proper resolution requires a thorough inquiry into the facts surrounding the adverse personnel action taken against each claimant, and the proper application of the law to those facts, class certification is improper as a matter of law. Because there is no common question of law or fact that facilitates adjudication of this case in class fashion, the plaintiffs have necessarily failed to meet the threshold requirements of Rule 23(a) of the Federal Rules of Civil Procedure.
 
 
 14
 A review of the law applicable to these claims well supports this holding. Fed.R.Civ.P. 23(a) sets forth the minimum requirements for the maintenance of a class action.
 
 
 15
 (a) Prerequisites to a Class Action. One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.
 
 
 16
 An action must satisfy all four of the prerequisites set forth by this subsection of Rule 23.
 
 
 17
 The plaintiffs assert that the Supreme Court cases of Elrod v. Burns[7] and Branti v. Finkel,[8] as well as subsequent decisions relying on those cases, establish the basic proposition that employees holding positions exempt from civil service legislation are protected, under the Constitution, from patronage removal or any substantial adverse personnel action. The result, they assert, is that class treatment of this cause is appropriate as the constant and pervading issue as to all plaintiffs is whether the governor and his staff pursued a pattern or practice of patronage dismissals. This however, is an incorrect formulation of the law, and a misconstruction of the facts of this case.
 
 
 18
 Read together, Elrod and Branti hold that patronage dismissals of certain public employees violate the rights to freedom of political belief and association protected by the First Amendment. In Elrod the plaintiffs--Republicans working as non-civil service sheriff's office employees--alleged that they were either discharged or threatened with discharge after a Democrat was elected to replace a Republican sheriff solely because they were not affiliated with or sponsored by the Democratic party. In a plurality opinion, the court held that the plaintiffs had stated a cognizable claim, reasoning that a non-policymaking official may not be dismissed based on party affiliation.
 
 
 19
 But the court expressly concluded, however, that patronage dismissals of governmental officials holding policymaking positions were justified "to ensure that policies which the electorate has sanctioned are effectively upheld." Id. at 372, 96 S.Ct. at 2689. Unfortunately, the court did not define "policymaking," but did offer the following guidelines:
 
 
 20
 An employee with responsibilities that are not well defined or are of broad scope more likely functions in a policymaking position. In determining whether an employee occupies a policymaking position, consideration should also be given to whether the employee acts as an adviser or formulates plans for the implementation of broad goals.
 
 
 21
 427 U.S. at 368, 96 S.Ct. at 2687.
 
 
 22
 In Branti, the court reformulated the policymaking/non-policymaking inquiry mandated by Elrod. Instead of focusing on "whether the label 'policymaker' or 'confidential' fits a particular person," the Court held that "the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." 445 U.S. at 518, 100 S.Ct. at 1295. See also Jones v. Dodson, 727 F.2d 1329 (4th Cir.1984). This court has subsequently read the Branti-Elrod analysis to apply not only to patronage dismissals, but also to patronage practices "that can be determined to be the substantial equivalent of dismissal." See Delong v. United States, 621 F.2d 618, 623-24 (4th Cir.1980). In Delong, the plaintiff, a Republican and State Director of the Farmers Home Administration in Maine, challenged his transfer and reassignment to the position of project assistant in Washington, D.C. This transfer and reassignment was part of an articulated policy of the Secretary of Agriculture to replace those Republicans heading state programs with Democrats. In sustaining the plaintiff's claim, the panel reasoned:
 
 
 23
 Dismissal or the threat of dismissal for political patronage reasons is of course the ultimate means of achieving by indirection the impermissible result of a direct command to a government employee to cease exercising protected rights of free political association and speech. This is Elrod and Branti 's specific, narrow application of the principle. We believe that when the principle is applied to patronage practices other than dismissal it is rightly confined to those that can be determined to be the substantial equivalent of dismissal.
 
 
 24
 In applying the principal, so limited, to the actual or threatened reassignment or transfer of a government employee, the issue thus becomes whether the specific reassignment or transfer of a government employee does in fact impose upon the employee such a Hobson's choice between resignation and surrender of protected rights as to be tantamount to outright dismissal. This much and no more, we conclude, is a necessary implication from the broader principle drawn upon in Elrod.... It is obvious that not every reassignment or transfer can fairly be thought to have this quality. It is equally obvious that in practical terms some might.
 
 
 25
 621 F.2d at 623-24 (emphasis added). Delong, like Branti, however, recognized that such patronage practices are not to be disturbed by the judiciary if party affiliation is an appropriate requirement for the job.[9] The teaching of Elrod-Branti then, is that mere allegation of political patronage dismissal falls short of stating a cause of action capable of class treatment. The inquiry must focus on the claim of the individual.
 
 III.
 
 26
 The task of determining whether a position is one in which political affiliation is a legitimate fact to be considered when making a personnel decision is admittedly difficult; a decision that must be subjected to thorough scrutiny. It is hard, however, to deny the truth in Judge Weinstein's account of political patronage as an accepted and necessary practice in democratic governance:
 
 
 27
 Though rarely lauded in party platforms and political speeches, patronage is a policy; the decisions whether to dispense it and how are policy decisions; and the patronage dispenser is among the most powerful of our political sachems. Failure to recognize this fact of political life would yield the paradoxical result that in attempting to curtail future patronage, the courts had merely entrenched existing patronage systems.
 
 
 28
 Ecker v. Cohalan, 542 F.Supp. 896, 903 (E.D.N.Y.1982).
 
 
 29
 Judge Weinstein's comment, though incisive, is not revolutionary. Democracy as we now know it has been built largely upon patronage practices. Throughout history, those elected to office have rewarded loyal supporters interested in carrying out the policies of the officials chosen by the electorate by appointing them to political positions. In so doing, the elected have also rewarded themselves, reaping the benefits of victory, by surrounding themselves with loyal employees (and supporters) and affording them the ability to promote the mandate of the electorate without undue internal dissent. Harmony through patronage has been and is today a basic tenet of American democratic politics.
 
 
 30
 Clearly, party affiliation is not an appropriate requirement in the dispensing of all government jobs. Country-wide civil service legislation, like that found in North Carolina, has established an ever increasing merit system for government employment, removing the majority of government positions from the patronage system. However, many positions are still properly subject to patronage, and democracy requires that such positions remain unaffected by merit legislation.
 
 
 31
 However wise, the courts have accepted the task of scrutinizing, after the fact, the practice of patronage dismissal in order to determine which state and local positions are properly within the political patronage system. We believe that Elrod and Branti, read together, mandate, at a minimum, the inquiry articulated by an en banc panel of the First Circuit in order to properly render a decision on the propriety of a patronage dismissal:
 
 
 32
 A threshold inquiry, which derives from Branti, involves examining whether the position at issue, no matter how policy-influencing or confidential it may be, relates to "partisan political interests ... [or] concerns." 445 U.S. at 519, 100 S.Ct. at 1295. That is, does the position involve government decisionmaking on issues where there is room for political disagreement on goals or their implementation? Otherwise stated, do party goals or programs affect the direction, pace, or quality of governance?
 
 
 33
 If this first inquiry is satisfied, the next step is to examine the particular responsibilities of the position to determine whether it resembles a policymaker, a privy to confidential information, a communicator, or some other office holder whose function is such that party affiliation is an equally appropriate requirement. We would note that in conducting this inquiry, courts focus on the powers inherent in a given office, as opposed to the functions performed by a particular occupant of that office. Tomczak [v. City of Chicago ], 765 F.2d , 640 [ (7 Cir.1985) ]; Ness [v. Marshall ] 660 F.2d , 522 [ (C.A.Pa.1981) ]; Alfaro de Quevedo v. De Jesus Schuck, 556 F.2d 591, 593 n. 4 (1st Cir.1977). "The relevant inquiry is to the function of the public office in question and not the actual past duties of the particular employee involved." Brown [v. Trench ], 787 F.2d , 168 [ (3rd Cir.1986) ]. "Thus, if an officeholder performs fewer or less important functions than usually attend his position, he may still be exempt from the prohibition against political terminations if his position inherently encompasses tasks that make his political affiliation an appropriate requirement for effective performance." Tomczak, 765 F.2d at 641.
 
 
 34
 Jimenez Fuentes v. Torres Gaztambide, 807 F.2d 236, 241-42 (1st Cir.1986) (en banc ), cert. denied, 481 U.S. 1014, 107 S.Ct. 1888, 95 L.Ed.2d 496 (1987).
 
 
 35
 This two-part test we believe is consistent with the generally accepted broad interpretation of Elrod-Branti and its progeny: "[P]olitical affiliation is an appropriate requirement when there is a rational connection between shared ideology and job performance." This interpretation, properly applied, "would exempt from protection most policymaking, and confidential employees." Savage v. Gorski, 850 F.2d 64, 68 (2d Cir.1988). The Supreme Court remains, to this date, in accord. In Rutan v. Republican Party of Illinois, --- U.S. ----, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990), the Court recognized that there are many government jobs for which party affiliation is an appropriate requirement. Specifically, the court affirmed the Elrod-Branti principal that "a government's interest in securing employees who will loyally implement its policies can be adequately served by choosing or dismissing certain high level employees on the basis of their political views." Rutan, --- U.S. at ----, 110 S.Ct. at 2737.[10]
 
 
 36
 The case at bar exemplifies this interpretation. The rationale for creating exempt positions, positions exempt from the protection afforded by the civil service statute, was to allow the governor to employ top level state employees on an at-will basis, and to reposition these employees as he felt necessary in order to further the agenda of the administration. We believe the fact that each of the plaintiffs in this case held an exempt position, so designated by the governor, creates a presumption at law that discharge or demotion was proper. We find that the statute, by its terms, authorizes the governor to reduce the number of exempt positions in order that the structure of the state government comply with the terms of the statute and that the appropriate government employees enjoy the protection of a civil service position, a position that clearly falls without the political patronage system.[11] While deference must be given to the decision to so designate those positions as exempt, or to reduce the number of exempt positions, that decision is not unreviewable. The matter is a question of law to be ultimately decided by the courts. See Savage v. Gorski, supra, at 69.
 
 IV.
 
 37
 Rule 23 by its terms requires a commonality of fact and law and a typicality of claims between plaintiffs in order that a case qualify for class treatment. Courts have recognized that the commonality and typicality requirements of Rule 23(a) tend to merge. "Both serve as guideposts for determining whether ... the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected...." General Telephone Co. of Southwest v. Falcon, 457 U.S. 147, 157 n. 13, 102 S.Ct. 2364, 2370 n. 13, 72 L.Ed.2d 740 (1982). In finding that those requirements were met in this case, the district court equated this action to that of a Title VII action[12] where it has long been recognized that suits alleging racial or ethnic discrimination are often, by their very nature, class suits. Id. at 158, 102 S.Ct. at 2371. However, this case presents a much different situation. The fact that a plaintiff here was subject to patronage dismissal does not necessarily implicate a violation of his constitutional rights, whereas racial or ethnic discrimination clearly does. An employee has an absolute right to be free from dismissal simply on the basis of race. We are well aware that the first amendment, by its terms, does not necessarily protect an employee from politically motivated employment decisions, including dismissal and demotion. As Justice Scalia observed:
 
 
 38
 The restrictions that the Constitution places upon the government in its capacity as lawmaker, i.e., as the regulator of private conduct, are not the same as the restrictions that it places upon the government in its capacity as employer....
 
 
 39
 Once it is acknowledged that the Constitution's prohibition against laws "abridging the freedom of speech" does not apply to laws enacted in the government's capacity as employer the same way it does to laws enacted in the government's capacity as regulator of private conduct, it may sometimes be difficult to assess what employment practices are permissible and what are not.
 
 
 40
 Rutan, supra, --- U.S. at ----, 110 S.Ct. at 2747-48 (Scalia, J., dissenting).
 
 
 41
 We believe that in political patronage cases, the critical and dispositive question is whether a particular position is one that requires, as a qualification for its performance, political affiliation. If it does, then dismissal or demotion is within the bounds of the Constitution. Clearly, then, the inquiry mandated by patronage cases must go beyond the pattern or practice inquiry common to Title VII cases and must focus on individual claims with the purpose of determining (1) whether the position held was subject to patronage dismissal, and (2) if not, whether there was another constitutionally sufficient reason, such as poor job performance, constant absenteeism or insubordination, to justify the action taken. It is not until such inquiries are complete, and the answer to the posed questions is no, that a constitutional violation is implicated.
 
 
 42
 The plaintiffs in this action held an array of jobs including, inter alia, Special Assistant to the Secretary of the North Carolina Fugitive Extradition Program, Business Manager of a state hospital, Troop Commander of the Highway Patrol, Field Office Manager for the Department of National Resources and Administrator of the North Carolina Archives. Job descriptions, responsibilities and expectations quite naturally were varied. Our survey of representative cases from this as well as other jurisdictions shows that similar challenges to patronage practices have been brought and that individual consideration has been necessary. Before delving into this survey, we note that it is not our intention here to make a determination about the merits of the claims brought by the plaintiffs. We cite these cases, a representative, not complete, list, only for illustrative purposes, and that illustration shows that these cases must necessarily be considered individually. It is also clear that application of Elrod-Branti in the various jurisdictions has produced seemingly inconsistent and unpredictable results.
 
 
 43
 The courts have found employees in the following positions to be subject to removal based on their political affiliation: confidential secretary, Savage v. Gorski,[13] supra; Deputy Service Officer, County Veterans Service Agency, id.; Coordinator, Pre-Trial Release Program, id.; Regional Director, Urban Development and Housing, Jimenez Fuentes v. Torres Gaztambide, 807 F.2d at 236; assistant city attorney, Finkelstein v. Barthelemy, 678 F.Supp. 1255 (E.D.La.1988); assistant county attorney, Tavano v. County of Niagara, 621 F.Supp. 345 (W.D.N.Y.), aff'd, 800 F.2d 1128 (2d Cir.1986); city police chief, Armstrong v. City of Arnett, 708 F.Supp. 320 (W.D.Okla.1989); Assistant Director of Public Information for county, see Brown v. Trench, 787 F.2d 167 (3d Cir.1986); First Deputy Commissioner of the Department of Water, see Tomczak v. City of Chicago, 765 F.2d 633 (7th Cir.1985); deputy sheriff, see McBee v. Jim Hogg County, 730 F.2d 1009 (5th Cir.1984) (en banc ); Superintendent of Employment for Chicago Park District, see Shakman v. Democratic Organization of Cook County, 722 F.2d 1307 (7th Cir.1983); assistant district attorney, see Livas v. Petka, 711 F.2d 798 (7th Cir.1983); assistant state attorney, see Mummau v. Ranck, 687 F.2d 9 (3d Cir.1982) (per curiam); fee agent, see Sweeney v. Bond, 669 F.2d 542 (8th Cir.), cert. denied, 459 U.S. 878, 103 S.Ct. 174, 74 L.Ed.2d 143 (1982); city solicitor and assistant solicitor, see Ness v. Marshall, 660 F.2d 517 (3d Cir.1981); Senior Citizens' Coordinator, see Nekolny v. Painter, 653 F.2d 1164 (7th Cir.1981), cert. denied, 455 U.S. 1021, 102 S.Ct. 1719, 72 L.Ed.2d 139 (1982); Deputy Parks Commissioner, see Ecker v. Cohalan, supra; state director of the Farmers Home Administration, see Committee to Protect the First Amendment Rights of Employees of the Department of Agriculture v. Bergland, 626 F.2d 875 (D.C.Cir.1979) (pre-Branti ); Brunton v. United States, 518 F.Supp. 223 (S.D. Ohio 1981).
 
 
 44
 Employees in the following positions were found not subject to dismissal under the Elrod-Branti formulation: School District Director of Food Services, Martinez v. Cotulla Indep. School Dist., 700 F.Supp. 17 (S.D.Tex.1988); School Superintendent, Kercado-Melendez v. Aponte-Roque, 829 F.2d 255 (1st Cir.1987), cert. denied, 486 U.S. 1044, 108 S.Ct. 2037, 100 L.Ed.2d 621 (1988); Electoral Board Registrar, see McConnell v. Adams, 829 F.2d 1319 (4th Cir.1987), cert. denied, 486 U.S. 1006, 108 S.Ct. 1731, 100 L.Ed.2d 195 (1988); city court bailiffs, see Meeks v. Grimes, 779 F.2d 417 (7th Cir.1985) (remanding for further findings); road-graders, see Horton v. Taylor, 767 F.2d 471 (8th Cir.1985); bookkeeper, see Grossart v. Dinaso, 758 F.2d 1221 (7th Cir.1985); deputy court clerks, see Barnes v. Bosley, 745 F.2d 501 (8th Cir.1984), cert. denied, 471 U.S. 1017, 105 S.Ct. 2022, 85 L.Ed.2d 303 (1985); deputy sheriff, see Jones v. Dodson, 727 F.2d 1329 (4th Cir.1984); Administrative Director, Pennsylvania Department of Transportation, Laskaris v. Thornburgh, 733 F.2d 260 (3d Cir.1984); Barrett v. Thomas, 649 F.2d 1193 (5th Cir.1981), cert. denied, 456 U.S. 925, 102 S.Ct. 1969, 72 L.Ed.2d 440 (1982); supervisor of county branch of the Auditor's office, see De La Cruz v. Pruitt, 590 F.Supp. 1296 (N.D.Ind.1984); city clerk, see Visser v. Magnarelli, 530 F.Supp. 1165 (N.D.N.Y.1982); attorney, Department of Social Services, see Layden v. Costello, 517 F.Supp. 860 (N.D.N.Y.1981). These cases, plentiful in number, further attest to the federal courts' reluctance to consider these matters in class actions.
 
 
 45
 Our research has uncovered no better example of Rule 23 abstention in political patronage cases than the First Circuit's disposition of the large number of cases that arose after the 1984 Puerto Rico gubernatorial election. This election resulted in the dismissal and demotion of many government employees. The resulting law suits presented the court with largely the same situation as we address here. Those who believed they were wrongly dismissed brought action seeking injunctive and monetary relief. Although, as the First Circuit described it, there was a "litany" of cases that arose from these patronage dismissals,[14] each was treated separately, tried on its own facts. The appeal was treated likewise. Such treatment was mandated by the need to make inquiry into the positions held by the litigants and the propriety of requiring political affiliation with that particular job. We can find no clearer illustration in the reported cases to demonstrate the need for individual determination of like patronage claims.[15]
 
 
 46
 Admittedly, under the law, as articulated by the Supreme Court, there is fair ground for litigation here and the plaintiffs must be given access to the courts to resolve their claims. However, the case at bar presents no substantial facts or questions of law common or typical to all members of the certified class. We can find no commonality or typicality between the claims of each plaintiff that would propel this case through class treatment when the positions held by each plaintiff were so divergent. The only question common to each member of the class is whether or not his or her position was one that was subject to patronage dismissal. This question is in no way dispositive and simply propels the action into a posture where judicial scrutiny is necessary for just adjudication; scrutiny that requires a district court to do a case by case, position by position, activity by activity analysis of the First Amendment questions raised by the pleadings. This truth is shown by the district court's own analysis of the motions for summary judgment. In order to pass on such motions, the court found it necessary to consider the claim of each plaintiff individually, applying a "position-by-position analysis, taking into consideration both the description of the job, if there is one, and such other evidence as is available on the actual duties performed by the occupant." We believe this to be proof positive that class disposition of this action is inappropriate. Class certification is only proper when a determinative critical issue overshadows all other issues. See In re: A.H. Robins Co., 880 F.2d 709 (4th Cir.), cert. denied, --- U.S. ----, 110 S.Ct. 377, 107 L.Ed.2d 362 (1989). In Robins, seven individual claimants, suing on their own behalf and as the proposed class representatives of all injured Dalkon Shield claimants, sought recovery against Aetna Casualty and Surety Company for injuries resulting from the use of an allegedly defective intrauterine device known as the Dalkon Shield. The question posed to the court was whether Aetna, as an insurance carrier for the manufacturer, that was neither the manufacturer nor vendor of the device, could be held liable in tort for any injuries sustained by persons using the device. Class certification was sustained by this court as the issue of Aetna's liability was common to all claimants. Here there is no such pervasive and dispositive issue. The requirements of Rule 23(a) have not, nor can they be, met. Elrod and Branti mandate decertification so that individual scrutiny may be given to each claimant's position. Accordingly, it was error for the district court to grant class certification and this case is hereby remanded for proceedings consistent with this opinion. The invalidation of the class certification necessarily mandates the invalidation of all orders heretofore entered involved in this appeal but not those from which no appeal is based. Further, because of the factual nature of the inquiry necessary for resolution of these individual cases, trial by jury is warranted.
 
 
 47
 We decline now to rule on the appellant's motion for recusal of the district judge. We believe that such an issue is to be resolved upon motion of the defendants at the district court level when these individual claims are debated. We do find the recusal issue here to be substantial and note that a thorough inquiry into the issue should be made upon motion, based on a complete and concise record.
 
 
 48
 REVERSED AND REMANDED WITH INSTRUCTIONS.
 
 MURNAGHAN, Circuit Judge, dissenting:
 
 49
 The issue that the panel here confronts--whether class treatment of the plaintiffs was appropriate--comes down to whether the plaintiffs are entitled to prove a pattern or practice of politically motivated discrimination as part of their prima facie case. If so, class certification was correct. The panel majority concludes that the "pattern or practice" method of proof is inappropriate in political patronage cases such as the one here and so reverses the district court's order of class certification. Because I find the reasoning of the panel majority on that issue unpersuasive, and therefore consider the court's certification of the class not to have been an abuse of discretion, I respectfully dissent.
 
 
 50
 The district court certified a class of individuals who, during the period from November 1984 to January 1985, occupied an "exempt" position in a North Carolina cabinet department and were subsequently subjected to adverse personnel actions because of their political affiliation or activities. The district court reasoned that class treatment was appropriate because whether the Martin Administration had engaged in a pattern or practice of politically motivated discharges and demotions was a question of fact common to all of the plaintiffs, which predominated over the individual issues.
 
 
 51
 The district court announced that it would first submit the question of whether there was a pattern or practice of politically motivated discrimination to the jury. If the jury should answer in the affirmative, said the district court, a presumption will arise that the individual members of the class were so discharged and the burden will then be on the defendants to prove, in each individual case, either that politically motivated discrimination was constitutionally justified or that the plaintiff would still have been fired in the absence of political discrimination.
 
 
 52
 Judge Russell, writing for the panel majority, has concluded that the "pattern or practice" method of proof adopted by the district court does not fit the political patronage context because not all politically motivated personnel actions taken against "exempt" office-holders violate the Constitution. Judge Russell points out that resolution of the claims will depend not only on whether political motivation played a part in the adverse personnel actions but also, for each plaintiff, on (1) whether the politically motivated action was justified; that is, whether political affiliation was an appropriate job requirement, and (2) whether there was a reason other than political affiliation that would, in truth, justify the action. Judge Russell concludes that the inquiry must go beyond, in the case of each plaintiff, whether that plaintiff had been subjected to a politically motivated discharge or demotion and instead concern whether the adverse personnel action was unconstitutional.
 
 
 53
 The fallacy of the panel majority's reasoning lies in the erroneous view that a class should only be entitled to show a pattern or practice of discrimination with instances of discrimination that are irrefutably unlawful. That conclusion rewrites existing pattern or practice law. In other contexts in which it has been used--such as Title VII cases alleging discrimination on the basis of race, sex or religion--a showing of a pattern or practice of discrimination has only established a presumption that the plaintiffs were subjected to unlawful discrimination. That presumption could always be rebutted by showing, in the individual case, that (1) the discriminatory factor was bona fide or (2) the asserted discriminatory factor did not cause the adverse action. See, e.g., Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 342, 97 S.Ct. 1843, 1858, 52 L.Ed.2d 396 (1977); 42 U.S.C. Sec. 2000e-2(e). Yet these two defensive arguments are the same two inquiries that, in Judge Russell's opinion, make pattern or practice proof inappropriate in the political setting. There simply is no significant distinction in that respect between, on the one hand, cases alleging political discrimination and, on the other, those alleging discrimination on the basis of race, sex or religion. In either context, the class's showing of a pattern of discrimination is based on instances that are not necessarily unlawful and the presumption that such a showing creates is not dispositive on the question of liability.
 
 
 54
 Moreover, Judge Russell's concern--that the initial presumption of political discrimination should not arise from legitimate instances of political patronage--does not fit the case we have before us. The plaintiffs who had jobs for which party affiliation was an appropriate requirement have already been dismissed from the case. The Elrod-Branti determination is a question of law, which the district court appropriately made on summary judgment. Indeed, the plaintiffs agreed to limit the evidence used to show a pattern of politically motivated discrimination to the actions taken against those plaintiffs who, as already determined by the district court, could not have been, consistent with the Constitution, discharged or demoted for political affiliation reasons.*
 
 
 55
 Finally, the scheme adopted by the district court fully comports with the way the Supreme Court and the Fourth Circuit have allocated the burden of proof in political patronage cases. Elrod v. Burns, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), and Branti v. Finkel, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980), place the burden of justifying politically motivated discharge squarely on the hiring authority. Elrod, 427 U.S. at 368, 96 S.Ct. at 2687; Branti, 445 U.S. at 518, 100 S.Ct. at 1294; see Jones v. Dodson, 727 F.2d 1329, 1334-35 (4th Cir.1984). Similarly, Mt. Healthy City School Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977), places the burden of proof on the public employer to show that a constitutionally legitimate reason, such as poor performance, justified discharge in the face of proof of a pattern of politically motivated adverse personnel actions. The scheme adopted by the district court, which would put the burden on the defendant to justify the adverse personnel actions once a pattern of politically motivated personnel actions had been shown, does not alter the burden of proof assignments under either Elrod-Branti or Mt. Healthy.
 
 
 56
 Accordingly, I respectfully dissent.
 
 
 
 [1]
 N.C.G.S. Sec. 126-5(d)(2)-(4) describes who are exempt employees:
 (2) The chief deputy or chief administrative assistant to the head of each State department who is designated either by statute or by the administrative head to act for and perform all of the duties of such administrative head during his absence or incapacity.
 (3) One confidential assistant and two confidential secretaries for each elected or appointed department head and one confidential secretary for each chief deputy or chief administrative assistant.
 (4) Other deputies, administrative assistants, division or agency heads or other employees, by whatever title, that serve in policy making positions and any confidential secretary or confidential assistant to any such deputy, administrative assistant, division or agency head or employee, such positions to be designated by the Governor....
 We note that N.C.G.S. Sec. 126-5 (1981 Repl.Vol.), prior to the 1985 amendment, is the relevant statute here.
 It is clear that this statute was drafted in conformity with the Supreme Court decisions of Elrod v. Burns and Branti v. Finkel discussed fully in Part II of this opinion.
 
 
 [2]
 At the time Governor Hunt left office, there were approximately 1,500 state employees that were designated as exempt under the State Personnel Act
 
 
 [3]
 We define, for purposes of this litigation, adverse personnel action to mean dismissal or any other action, including demotion or transfer, that is the functional equivalent of dismissal
 
 
 [4]
 The defendants named in this case as of the date of the certification order are as follows: Governor Martin; S. Thomas Rhodes, then Secretary of Natural Resources Community Development; James Harrington, Secretary of Transportation; Phillip J. Kirk, then Secretary of Human Resources; Secretary of Crime Control and Public Safety Joseph W. Dean; Secretary of Correction Aaron J. Johnson; Secretary of Revenue Helen A. Powers; Secretary of Cultural Resources Patric G. Dorsey; Secretary of Administration James S. Lofton; Secretary of Commerce Claude Pope (now deceased); former Secretary of Administration Grace Rohrer; former Secretary of Commerce Howard Haworth; and Secretary of Human Resources David H. Flaherty
 
 
 [5]
 Title 28 U.S.C. Sec. 455 provides, in pertinent part:
 (a) Any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.
 (b) He shall also disqualify himself in the following circumstances:
 (5) He or his spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person:
 (iv) Is to the judge's knowledge likely to be a material witness in the proceeding.
 
 
 [6]
 It has been suggested by the plaintiffs that Ms. Sherrill was given free rein to make personnel decisions, including decisions to terminate state employees, without the knowledge or approval of the governor. At this time, we find the record to be incomplete as to such allegations
 
 
 [7]
 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976)
 
 
 [8]
 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1979)
 
 
 [9]
 We aim our focus on Branti and Elrod because we believe that line of cases to present the necessary threshold analysis to be undertaken here. We recognize, as do the litigants and the district court, that Elrod-Branti may not be dispositive in each and every case and that further analysis of an individual claim may be warranted. For example, individual cases that present the problem of "mixed motive" discharge may be resolved through analysis of the Supreme Court's ruling in Mt. Healthy City School Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). Further, if the district court finds that a plaintiff held a position not subject to patronage dismissal, then an inquiry based on the Pickering v. Board of Educ., 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1969), and Connick v. Myers, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), line of cases may be necessary. Our ruling today does not mandate that we make such an inquiry
 
 
 [10]
 The Seventh Circuit has also focused on the office or position rather than the office holder when ruling in matters concerning political patronage. See Meeks v. Grimes, 779 F.2d 417, 419 (7th Cir.1985)
 
 
 [11]
 Before us is a situation where Governor Martin was attempting to bring the North Carolina employment scheme into conformity with the civil employee statute by cutting down on the number of exempt positions extant in North Carolina. Unfortunately, Governor Martin was faced with the task of trimming exempt positions that under the statute most likely should never have been so designated. This we find to be bipartisan decision and not a decision based on the governor's affiliation to the Republican party
 
 
 [12]
 See Title VII of the Civil Rights Act of 1964, 42 U.S.C. Secs. 2000e et seq
 
 
 [13]
 We here footnote Savage to demonstrate that class action cases such as this have, to this date, not been maintained in federal court. In Savage, the three plaintiffs were among 69 New York Civil Service employees holding exempt positions pursuant to New York Statute. Those employees were terminated when the position of Erie County Executive changed hands due to election. The plaintiffs were given leave to reapply. At the time the action was brought, 143 was the total number of exempt positions in the county. The defendants conceded that each of these exempt employees was let go for patronage reasons. We believe the facts of this case are closely aligned to those here presented, although there are some significant variants. We are taken with the fact that in Savage the case did not proceed as a class action, lending force to the proposition here made that political patronage cases are inappropriate for class certification for they require close scrutiny of the facts surrounding the claims of each plaintiff
 
 
 [14]
 See Vazquez Rios v. Hernandez Colon, 819 F.2d 319, 320 (1st Cir.1987)
 
 
 [15]
 In Rutan v. Republican Party, the circuit court, noting that the district had failed to address the question of class certification, reviewed the case as one brought by individual claimants and saw no purpose pursuing the issue of class certification in that political patronage cause of action. See 868 F.2d 943, 947 (7th Cir.1989)
 
 
 *
 And, in the absence of such an agreement, the Fourth Circuit or the district court could require the limitation as a matter of law--a much more rational measure than completely forbidding pattern or practice evidence