PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

CELESTE NADER, Individually and
on behalf of a class of State of
Maryland Employees similarly
situated,

*Plaintiff-Appellant,*

v.

FLOYD R. BLAIR, Esquire; ROBERT
L. EHRLICH, Individually and as
Governor; JOSEPH E. STEFFEN, JR.;
CHRISTOPHER J. MCCABE; NEIL E.
MERKEL; HEINRICH JOSEPH
LOSEMANN, JR.; ANTHONY COBB,

*Defendants-Appellees.*

No. 07-2107

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
William D. Quarles, Jr., District Judge.
(1:06-cv-02890-WDQ)

Argued: October 29, 2008

Decided: December 12, 2008

Before KING, GREGORY, and SHEDD, Circuit Judges.

Affirmed by published opinion. Judge Gregory wrote the
opinion, in which Judge King and Judge Shedd joined.

## COUNSEL

**ARGUED:** Joseph Schiffer Kaufman, SCHULMAN & KAUFMAN, L.L.C., Baltimore, Maryland, for Appellant. Julia Doyle Bernhardt, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Appellees. **ON BRIEF:** Douglas F. Gansler, Attorney General of Maryland, David E. Beller, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Appellees Floyd R. Blair, Esquire, Robert L. Ehrlich, Individually and as Governor, Christopher J. McCabe, Neil E. Merkel, Heinrich Joseph Losemann, Jr., and Anthony Cobb.

## OPINION

GREGORY, Circuit Judge:

Celeste Nader appeals the district court's decision denying her motion for class certification and her motion to strike the Defendants' supporting affidavits, and granting the Defendants' motion for summary judgment on her claims of unconstitutional termination and violations of due process. For the reasons set forth below, we affirm the decision of the district court.

I.

Nader was employed for over thirty-eight years by the Baltimore City Department of Social Services ("BCDSS"), which is a local social-services agency within the Maryland Department of Human Resources ("DHR"). Nader first began working at BCDSS in 1965 as a case worker, and her position was classified as part of the merit system. Nader received several promotions while she was employed at BCDSS, with her final promotion coming in November 2001. As a result of the

November 2001 promotion, Nader held the position of Assistant Director of Business Management and Financial Services ("Assistant Director") and was one of six assistant directors who reported directly to the Director of BCDSS. Nader's position was classified as part of the "management service" of the Maryland state personnel system, which meant that she was considered an at-will employee and could be "terminated from employment for any reason, solely in the discretion of the appointing authority." *See* Md. Code Ann., State Pers. & Pensions § 11-305 (2004 Repl. Vol.). At the time of her promotion, Nader signed a Position Description for the Assistant Director position, which indicated that her position was part of the management service.

According to the Position Description, the main purpose of the position "is to provide leadership, management, control, coordination and monitor the activities and services provided by the Administrative Support Units." (J.A. 26.) The Assistant Director "oversees three major administrative units and sub-units," including Budget and Accounting, the Automated Systems Office, and Office Services. (*Id.*)

The Position Description further describes the "essential job functions" of the Assistant Director and provides a percentage of time or effort that must be devoted to each function. (*See id.*) The Position Description indicates that twenty percent of the Assistant Director's efforts should be devoted to administration. Among her administrative duties, the Assistant Director is a member of the agency's executive administrative team, and in that capacity she must "plan, coordinate, and evaluate agency operations." (*Id.*) Moreover, the Assistant Director must "[p]rovide leadership in business activities and inform [the] staff of appropriate policies and procedures." (*Id.*)

The Position Description allocates another twenty percent of the Assistant Director's time towards budget and accounting duties. The Assistant Director must "[e]nsure that fiscal

activities are performed in accordance with federal, state, and local policies, procedures, and strategic plans," as well as "[d]irect fiscal operations of the department including reports, payroll, internal control, bank reconciliation, and collection activities." (*Id.*) In this capacity, the Assistant Director over-sees a staff of eighty-five employees who provide extensive financial support services for the Administrative and Line Units within BCDSS. According to the Position Description, "[t]he budget is the overall responsibility of the [Assistant Director]." (J.A. 27.) Accordingly, the Assistant Director is expected to "[r]epresent all departmental needs and initiatives during budget preparation." (J.A. 36.)

The Assistant Director is expected to devote ten percent of her time towards auditing tasks, which requires her to "[c]oordinate agencywide audit activities with federal, state, legislative and local auditors" and to "[r]epresent [BCDSS] in Annapolis to defend [its] audit reports." (J.A. 30.) After the audits are completed, the Assistant Director must inform the Director's Cabinet of the findings and recommendations and "[p]repare responses to audit findings in a manner that recog-nizes [the] agency's overall mission and goal . . . ." (J.A. 36.)

Another ten percent of the Assistant Director's efforts are to be devoted to business management activities. According to the Position Description, the Assistant Director must "[c]oordinate agency initiatives and plans with federal, state, local departments and the community" and "[r]epresent the agency city-wide and promote a positive agency image." (J.A. 30.) In addition, the Assistant Director is to act as the BCDSS liaison to the Mayor's Mental Health Committee. In this role, the Assistant Director is to meet with community and agency representatives to make sure that mental health services are available and to make site visits to mental health facilities. Also included among the Business Management Activities are several duties to be performed on the Director's behalf, including "[r]eview[ing] and sign[ing] for [the] Director 600 personnel contracts for contractual employees," "sign[ing]

medical consent forms for adults for whom [the] agency has guardianship when emergency medical treatment is needed," and "[h]andl[ing] all issues in the absence of the Director as indicated." (J.A. 31.)

In addition to describing the essential job functions to be performed by the Assistant Director, the Position Description lists the types of work contacts that the Assistant Director is expected to have with other agencies and individuals. The Assistant Director is to have daily contact with state personnel from DHR Operations, the Family Investment Administration, and the Social Services Administration "to discuss relevant issues impacting this department." (J.A. 31.) Moreover, the Assistant Director is to meet weekly with the Mayor of Baltimore or other designated executive staff members "to share information about the department" and to meet weekly with state and local budget and finance staff "to negotiate budget and fiscal activities." (*Id.*)

Furthermore, the Position Description lists several types of decisions entrusted to the Assistant Director, including "[d]etermining priorities in line with Agency mission goals and objectives as it relates to workload productivity, fiscal processing, etc." (J.A. 32.) With regard to the decisions made by the Assistant Director, she is to receive only "managerial supervision," meaning that the Director of BCDSS would supervise her actions at the least intrusive level. (*Id.*)

Notwithstanding the job responsibilities listed in the job description, Nader maintains that Floyd R. Blair, who was the Interim Director of BCDSS at the time Nader received her notice of termination, never actually assigned her any tasks that required her to make policymaking decisions. Moreover, Nader alleges that the Position Description did not state that she would make policy decisions, nor did it require any particular political affiliation.

Blair became the Interim Director of BCDSS in August 2003. On November 19, 2003, Blair gave Nader a memoran-

dum in which he terminated her employment effective December 5, 2003. As explanation for the termination, the memorandum stated only that it was due to "changes" Blair was making at BCDSS. (J.A. 14.) The memorandum also notified Nader that pursuant to § 11-113 of the Maryland State Personnel and Pensions Article, she had fifteen days from receipt of the memorandum in which to appeal the termination. The memorandum gave Nader the opportunity to resign in lieu of termination, and Nader ultimately elected that option.

On December 17, 2003, more than fifteen days after receipt of the memorandum, Nader filed an administrative appeal. DHR's Employer-Employee Relations Unit dismissed the appeal, both because it was untimely and because it found that Nader had not met her burden of showing that the termination was illegal or unconstitutional. Nader filed a petition for judicial review of the administrative decision in the Maryland state court system but was unsuccessful, both due to the untimeliness of the initial appeal as well as on the merits of the claim.

Nader next initiated this civil action in the United States District Court for the District of Maryland. Nader brought a class action suit against Blair, former Interim Director of BCDSS; Christopher J. McCabe, former Secretary of the Maryland DHR; Robert L. Ehrlich, Jr., former Governor of Maryland; and other state employees. In Counts I and II of the complaint, Nader alleged that she had been unlawfully terminated based on her political affiliation, in violation of the First and Fourteenth Amendments of the United States Constitution and Article 40 of the Maryland Declaration of Rights. In Count III of the complaint, Nader alleged that the Defendants' conduct also constituted a violation of the Due Process Clause of the Fourteenth Amendment.[1]

---

[1]Nader alleged in Count IV of the complaint that the Defendants were engaged in an unlawful civil conspiracy, and the district court granted summary judgment to the Defendants on this Count. Nader did not appeal this decision.

Before the parties engaged in discovery, the Defendants moved to dismiss or, in the alternative, for summary judgment on the claims. Nader moved to strike the Defendants' supporting affidavits. The district court denied class certification, denied Nader's motion to strike the Defendants' supporting affidavits, and granted the Defendants' motion for summary judgment. Nader appeals.

## II.

We review a district court's grant of a motion for summary judgment de novo, applying the same legal standards as the district court. *Nguyen v. CNA Corp.*, 44 F.3d 234, 236 (4th Cir. 1995). "The district court should only grant a motion for summary judgment where there is no genuine dispute as to an issue of material fact, and the moving party is entitled to summary judgment as a matter of law." *Id.* at 236-37 (citing Fed. R. Civ. P. 56(c)). In deciding a motion for summary judgment, the district court must view all reasonable inferences drawn from the evidence in the light that is most favorable to the non-moving party. *Id.* at 237. We review a district court's denial of a motion to allow further discovery before ruling on a summary judgment motion under an abuse of discretion standard. *See Strag v. Bd. of Trs.*, 55 F.3d 943, 952-53 (4th Cir. 1995); *Nguyen*, 44 F.3d at 242.

## A.

Nader first contends that the district court erred in determining as a matter of law that the Assistant Director position was the type of position that could be subject to a patronage dismissal. A pair of Supreme Court decisions, *Elrod v. Burns*, 427 U.S. 347 (1976), and *Branti v. Finkel*, 445 U.S. 507 (1980), established the standards for determining whether patronage dismissals of government employees violate the First and Fourteenth Amendment rights of freedom of political belief and association. In determining whether political patronage dismissals are constitutionally permissible, the

essential question "is whether the hiring authority can demon-strate that party affiliation is an appropriate requirement for the effective performance of the public office involved." *Branti*, 445 U.S. at 518; *accord Stott v. Haworth*, 916 F.2d 134, 140 (4th Cir. 1990). This Court has adopted the "gener-ally accepted broad interpretation" derived from the *Elrod-Branti* line of cases that "[p]olitical affiliation is an appropri-ate requirement when there is a rational connection between shared ideology and job performance." *Stott*, 916 F.2d at 142 (internal quotations omitted).

In *Stott*, this Court adopted a two-part formulation of the *Elrod-Branti* analysis that was first articulated by an *en banc* panel of the First Circuit in *Jimenez Fuentes v. Torres Gaz-tambide*, 807 F.2d 236, 241-42 (1st Cir. 1986). Under this two-part analysis, a court must first "examin[e] whether the position at issue, no matter how policy-influencing or confi-dential it may be, relates to partisan political interests . . . or concerns." *Stott*, 916 F.2d at 141 (internal quotations omit-ted). In particular, the court must consider whether the posi-tion "involve[s] government decisionmaking on issues where there is room for political disagreement on goals or their implementation[.]" *Id.* at 141-42 (internal quotations omitted).

If the position satisfies the first part of the analysis, the court must next "examine the particular responsibilities of the position to determine whether it resembles a policymaker, a privy to confidential information, a communicator, or some other office holder whose function is such that party affilia-tion is an equally appropriate requirement." *Id.* at 142 (inter-nal quotations omitted). In judging whether the particular responsibilities of a position meet this test, "courts focus on the powers inherent in a given office, as opposed to the func-tions performed by a particular occupant of that office." *Id.* (internal quotations omitted). Indeed, even "if an officeholder performs fewer or less important functions than usually attend his position, he may still be exempt from the prohibition against political terminations if his position inherently encom-

passes tasks that make his political affiliation an appropriate requirement for effective performance." *Id.* (internal quotations omitted).

In determining whether a particular position is that of a policymaker, "[a]n employee with responsibilities that are not well defined or are of broad scope" is more likely to be a policymaker, and "consideration should also be given to whether the employee acts as an advisor or formulates plans for the implementation of broad goals." *Elrod*, 427 U.S. at 368. Other relevant factors in distinguishing a policymaker from a non-policymaker include: "relative pay, technical competence, power to control others, authority to speak in the name of policymakers, public perception, influence on programs, contact with elected officials and responsiveness to partisan politics and political leaders." *Jimenez Fuentes*, 807 F.2d at 242 (internal quotations omitted).

Examining the inherent nature of the job responsibilities for the Assistant Director position under the *Elrod-Branti* two-part analysis, we find that the position is one for which political affiliation is a constitutionally permissible ground for termination. With regard to the first part of the analysis, which is whether the position relates to partisan political interests or concerns, positions within social-services agencies clearly may satisfy this requirement. *See, e.g.*, *Flynn v. City of Boston*, 140 F.3d 42, 44-46 (1st Cir. 1998) (finding that associate director positions in a community social-services agency related to partisan political interests); *Vona v. County of Niagara*, 119 F.3d 201, 208 (2d Cir. 1997) (determining that assistant social services attorney position was related to "political and ideological concerns"). Moreover, the Assistant Director position directly involved budgetary issues within the BCDSS, and undoubtedly there could be strong partisan disagreement about the funding for different programs and services.

Turning to the second part of the *Elrod-Branti* analysis—whether the particular responsibilities of the Assistant

Director position are those of a policymaker, someone who is
privy to confidential information, or a communicator—the job
responsibilities listed in the Position Description satisfy this
requirement. First, the Assistant Director is a member of
BCDSS's executive administrative team, and in this capacity
she helps shape the overarching policies and programs of
BCDSS. The Assistant Director is also responsible for prepa-
ration of BCDSS's budget and for oversight of the budget,
accounting, auditing, and office services operations. The
Assistant Director's responsibility for the budget alone pro-
vides ample evidence of the policymaking nature of her posi-
tion, as such decisions may be quite political and contentious.
*See Blair v. Meade*, 76 F.3d 97, 100 (6th Cir. 1996) ("The
efficient and orderly administration of a budget is an integral
part of the budgetary process and certainly has key political
implications and consequences."). Furthermore, the Assistant
Director is authorized to act for the Director of BCDSS in the
Director's absence, evidencing the policymaking nature of her
position. Because of the nature of the responsibilities assigned
to the Assistant Director, she has access to a variety of confi-
dential information, including information relating to the bud-
get, personnel matters, and audits.

Several of the job responsibilities listed in the Position
Description also require the Assistant Director to be a com-
municator for BCDSS. The Assistant Director is to have daily
contact with state personnel from DHR Operations, the Fam-
ily Investment Administration, and the Social Services
Administration to discuss issues within BCDSS. Moreover,
the Assistant Director is to meet weekly with the Mayor of
Baltimore or other designated executive staff members to
share information about BCDSS and to meet weekly with
state and local finance staff regarding the budget and other
fiscal activities. As part of her auditing duties, the Assistant
Director must represent the agency to defend its audit reports,
and then inform the Director's Cabinet of the findings and
prepare responses to the audits in line with the policies of
BCDSS. Given these tasks, it is clear that the Assistant Direc-

tor is expected to represent BCDSS in substantive interactions with other departments and outside agencies.

Nevertheless, Nader contends that the district court erred in granting summary judgment because there is no evidence that she was in fact relied upon in policymaking decisions, and without such evidence, a court may not determine that the Assistant Director position is that of a policymaker. This contention is without merit.

According to *Stott*, "courts focus on the powers inherent in a given office, as opposed to the functions performed by a particular occupant of that office." 916 F.2d at 142 (internal quotations omitted). A court will "only look past the job description where the plaintiff demonstrates some systematic unreliability," such as where "the description has been manipulated in some manner by officials looking to expand their political power." *Allen v. Martin*, 460 F.3d 939, 944 (7th Cir. 2006). While testimony regarding one's actual job duties "may be useful in filling gaps left by the official job description and in amplifying the responsibilities listed in the description," "such testimony cannot be used to belittle the job into one with less significant responsibilities than identified in the official description." *Stott v. Martin*, 783 F. Supp. 970, 976 n.6 (E.D.N.C. 1992).

Nader has put forth no evidence that the job description contains any "systematic unreliability" to warrant looking past the Position Description to the actual duties she performed, and it is uncontroverted that she signed the Position Description assenting to those duties and responsibilities. Moreover, the fact that Blair did not assign her any policymaking tasks would not reveal any systematic unreliability in the Position Description, since the Position Description was created in 2001 and Blair did not become Interim Director of BCDSS until 2003.

Nader also argues that the district court abused its discretion in granting summary judgment to the Defendants before

allowing her the opportunity to engage in discovery. Generally, a district court must refuse summary judgment "where the nonmoving party has not had the opportunity to discover information that is essential to [its] opposition." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 n.5 (1986); *accord Nguyen*, 44 F.3d at 242. However, a party generally must comply with Federal Rule of Civil Procedure 56(f), which requires that it set out the reasons for discovery in an affidavit, and it cannot withstand a motion for summary judgment by merely asserting in its brief that discovery was necessary. *See Hayes v. N. State Law Enforcement Officers Ass'n*, 10 F.3d 207, 215 (4th Cir. 1993). Nevertheless, strict compliance with Rule 56(f) affidavits may not be necessary where the circumstances are such that "the nonmoving party, through no fault of its own, has had little or no opportunity to conduct discovery, and when fact-intensive issues, such as intent, are involved," provided that "the nonmoving party has adequately informed the district court that the motion is pre-mature and that more discovery is necessary." *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002).

Here, Nader failed to file a timely affidavit under Rule 56(f) that particularly set out the reasons for further discovery, and the district court denied Nader's motion on that ground. Even if the district court had considered Nader's untimely affidavit, it would not have affected the district court's decision to proceed with ruling on the motion for summary judgment. In the affidavit, Nader claimed that she needed to engage in discovery regarding the Defendants' motives and intent. However, the Defendants' motives and intent were not at issue in the motion for summary judgment, as this motion concerned only whether Nader's position was such that she could be terminated for political reasons, not whether political reasons did in fact motivate her termination. Evidence of the Defendants' motives or intent would not be essential to Nader's opposition of the Defendants' motion for summary judgment, and thus discovery on that issue was unnecessary.

Because the job responsibilities listed in the Position Description satisfy the *Elrod-Branti* two-part test and Nader provided no evidence that her actual job duties needed to be considered or that further discovery was necessary, this Court affirms the decision of the district court granting summary judgment on this claim.[2]

## B.

Nader next contends that she was deprived of the procedural protections of Maryland law because BCDSS failed to follow its own procedural rules and regulations regarding terminations. Nader relies on the *Accardi* doctrine, which provides that when an agency fails to follow its own procedures or regulations, that agency's actions are generally invalid. *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954); *see Pollock v. Patuxent Inst. Bd. of Review*, 823 A.2d 626, 639-45 (Md. 2003) (discussing the various approaches of Maryland courts in applying the *Accardi* doctrine).

Nader argues that the *Accardi* doctrine was violated because § 11-106 of the Maryland State Personnel and Pensions Article provides that employees discharged for misconduct are entitled to certain procedural protections, including notice and a pre-termination meeting. In support of this contention, Nader relies on *Danaher v. Dep't of Labor, Licensing & Regulation*, 811 A.2d 359, 375 (Md. Ct. Spec. App. 2002), in which the Court of Special Appeals of Maryland held that the procedural protections of § 11-106 applied to management service employees.

Nader's reliance on *Danaher* for the proposition that man-

---

[2]The Defendants alternatively claimed that the decision of the district court should be affirmed on the grounds of qualified immunity. Because we find that the Defendants have committed no constitutional violation, we need not consider their claim of qualified immunity.

agement service employees are always afforded the procedural protections of § 11-106 is misplaced, however. Subsequent to the decision in *Danaher*, Maryland courts have clarified that the procedural protections of § 11-106 apply only when an employee is discharged for misconduct and have held that the *Danaher* decision should be so limited. *See Dozier v. Dep't of Human Res.*, 883 A.2d 1025, 1031 (Md. Ct. Spec. App. 2005); *see also Pub. Serv. Comm'n v. Wilson,* 882 A.2d 849, 882-84 (Md. 2005). Nader concedes that she was not discharged for misconduct; therefore, BCDSS was required to comply only with the procedural requirements of §§ 11-305 and 11-113 of the Maryland State Personnel and Pensions Article, which give the terminated employee the right to file a written appeal within fifteen days of receiving the notice of termination. Nader was given notice of her right to file an administrative appeal but failed to file it in a timely manner, which precluded her from pursuing her claims administratively or through the Maryland judicial system. *See Public Service Comm'n*, 882 A.2d at 888-89. In fact, Nader received even more process than that to which she was entitled, because DHR's Employer-Employee Relations Unit considered her untimely appeal but ultimately dismissed it on timeliness grounds and on its merits. Given this, Nader's claim that BCDSS failed to provide her with the procedural protections of Maryland law and agency regulations must fail.

## C.

Finally, Nader contends that the affidavit of Ginger Scott, the Assistant Director of BCDSS's Office of Human Resources, should not have been considered by the district court in ruling on the motion for summary judgment. Specifically, Nader argues that Scott did not become an employee at BCDSS until September 22, 2003, and thus she had no personal knowledge of events prior to that date, including the creation of the Position Description and other employment documents. We review the district court's decision regarding the admissibility of an affidavit for an abuse of discretion, and

the factual determinations underlying the evidentiary ruling for clear error. *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996).

Under Rule 56(e) of the Federal Rules of Civil Procedure, "[a] supporting or opposing affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated." While it is true that Scott did not have personal knowledge of the records in that she did not personally take part in or witness the creation of the documents, her testimony was based on her personal knowledge as the custodian of the records she maintained at BCDSS. It is well established that employees who are familiar with the record-keeping practices of a business are qualified to speak from personal knowledge that particular documents are admissible business records, and affidavits sworn by such employees constitute appropriate summary judgment evidence. Fed. R. Evid. 803(6); *Thanongsinh v. Bd. of Educ.*, 462 F.3d 762, 777 (7th Cir. 2006); *FDIC v. Patel*, 46 F.3d 482, 484 (5th Cir. 1995). Scott's affidavit did no more than provide the foundation for the admission of these business records, and thus the trial court did not err in considering the affidavit in the motion for summary judgment.

III.

For the foregoing reasons, we affirm the judgment of the district court.

*AFFIRMED*