**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

─────────────

**No. 16-1751**

─────────────

KERI L. BORZILLERI,

       Plaintiff - Appellant,

v.

MARILYN J. MOSBY, in her official and personal capacities; STATE OF
MARYLAND,

       Defendants - Appellees.

─────────────

Appeal from the United States District Court for the District of Maryland, at Baltimore.
J. Frederick Motz, Senior District Judge.  (1:15-cv-03760-JFM)

─────────────

Argued:  September 14, 2017          Decided:  October 17, 2017

─────────────

Before WILKINSON, TRAXLER, and AGEE, Circuit Judges.

─────────────

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Judge
Traxler and Judge Agee joined.

─────────────

**ARGUED:** Stacey Kamya Grigsby, BOIES, SCHILLER & FLEXNER LLP,
Washington, D.C., for Appellant.  Patrick Browning Hughes, OFFICE OF THE
ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Appellees.  **ON
BRIEF:** Ryan Y. Park, Washington, D.C., Nafees Syed, BOIES, SCHILLER &
FLEXNER LLP, New York, New York, for Appellant.  Brian E. Frosh, Attorney General
of Maryland, Julia Doyle Bernhardt, Assistant Attorney General, OFFICE OF THE
ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Appellees.

WILKINSON, Circuit Judge:

This case arises out of appellant Keri Borzilleri's suit alleging that appellee Marilyn Mosby fired her for supporting Mosby's political rival, thereby violating Borzilleri's First Amendment rights. The district court determined that, as an Assistant State's Attorney, Borzilleri was a policymaker exempt from the First Amendment's protection against patronage dismissals. We affirm. To hold otherwise would undermine the public mandate bestowed upon the victor of a hard-fought election and would needlessly interfere with a state official's managerial prerogative.

I.

A.

On January 5, 2015, Marilyn Mosby took office as Baltimore City State's Attorney, an elected position with authority over more than one hundred prosecutors. Four days later, Mosby fired Assistant State's Attorney Keri Borzilleri without explanation. As an ASA for nine years, Borzilleri had made charging decisions, negotiated plea deals, and tried serious cases. Near the end of her tenure, she had also served as one of the office's three "Community Prosecutors," tasked with prosecuting complex crimes and liaising with local police and city residents. Borzilleri's performance was, by her account, exemplary. She alleges—and for the purposes of resolving this appeal, we assume—that the sole motivation for Borzilleri's termination was her prior support for Mosby's political opponent.

The trouble began in 2014, when Borzilleri took sides in a bruising Democratic primary battle for Baltimore City State's Attorney. She supported Gregg Bernstein, the

2

incumbent, over Mosby, a former colleague. Although Borzilleri had no official role in Bernstein's campaign and never donated money to it, she attended Bernstein's campaign events, placed a Bernstein sign in front of her home, and hosted a gathering of approximately twenty Bernstein supporters. Photos of the event appeared on Facebook. According to Borzilleri, her once-cordial relationship with Mosby quickly soured. Borzilleri alleged that on two occasions after she began supporting Bernstein, Mosby glared at her and declined to acknowledge her in public.

Mosby defeated Bernstein in the June 2014 primary and went on to win the general election that November. Three days after Mosby took office, a newly appointed political deputy asked Borzilleri about Bernstein's campaign. She explained her role. The following day, she was fired without cause.

B.

Borzilleri filed suit against Mosby in the District of Maryland on December 9, 2015. She sought damages under 42 U.S.C. § 1983 for violations of her First Amendment rights to free speech and free association, for violations of her freedoms of speech and association guaranteed by Article 40 of the Maryland Declaration of Rights, and for abusive discharge under Maryland tort law. Mosby filed a motion to dismiss all counts for failure to state a claim upon which relief can be granted.

On May 31, 2016, the district court granted Mosby's motion. *Borzilleri v. Mosby*, 189 F. Supp. 3d 551 (D. Md. 2016). It dismissed with prejudice Borzilleri's state and federal free association claims and her federal free speech claim, and dismissed without prejudice her remaining state law claims. As to Borzilleri's free association claims, the

3

district court concluded that a Baltimore City ASA was a policymaker under the Supreme Court's decisions in *Elrod v. Burns*, 427 U.S. 347 (1976), and *Branti v. Finkel*, 445 U.S. 507 (1980), and that political loyalty to the State's Attorney was thus an "appropriate requirement" for the job. 189 F. Supp. 3d at 560. Because Maryland courts interpret Article 40's freedom of association protections *in pari materia* with the First Amendment's, the district court resolved the state law association claim on the same grounds. The district court also relied on Borzilleri's status as a policymaker to resolve her federal free speech claim, holding that "where political affiliation is a proper requirement" for employment, the "balance [of interests] tips decisively in favor of the government." 189 F. Supp. 3d at 562. Alternatively, the district court held that Mosby was entitled to qualified immunity on both federal claims. With the state free speech claim and the abusive discharge claim resting on distinct state law questions, and no other federal issues before it, the court dismissed Borzilleri's remaining state law claims without prejudice.

This appeal followed. In reviewing a dismissal under Federal Rule of Civil Procedure 12(b)(6), we review questions of law *de novo* and accept pleaded facts as true. *King v. Rubenstein*, 825 F.3d 206, 212, 214 (4th Cir. 2016).

## II.

We first consider whether Borzilleri's firing violated her First Amendment right to free association.

### A.

4

The Supreme Court first confronted the constitutionality of political patronage in *Elrod v. Burns*, 427 U.S. 347 (1976). A plurality of the Court concluded that conditioning public employment on party loyalty was tantamount to a system of "coerced belief" in violation of the First Amendment's guarantee of free association. *Id*. at 355. And although there was no majority opinion, *Elrod* came to stand for the proposition that under the First Amendment, "a nonpolicymaking, nonconfidential government employee" cannot be "discharged or threatened with discharge from a job that he is satisfactorily performing upon the sole ground of his political beliefs." *Id*. at 375 (Stewart, J., concurring in the judgment). As those qualifiers suggest, the decision carved out a narrow exception for policymakers or other sensitive government positions.

*Branti v. Finkel*, 445 U.S. 507 (1980), clarified the policymaker exception to the prohibition on patronage firings. In holding that public defenders were not policymakers, the Court explained that "the ultimate inquiry is not whether the label 'policymaker' or 'confidential' fits a particular position; rather, the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." *Id*. at 518.

Guided by those precedents, this court has adopted a two-part test for determining whether a particular position is a policymaking one and therefore exempt from the constitutional prohibition on patronage dismissal. *See Stott v. Haworth*, 916 F.2d 134 (4th Cir. 1990). First, we ask whether "the position involve[s] government decisionmaking on issues where there is room for political disagreement on goals or their implementation." *Id*. at 141. If so, we "examine the particular responsibilities of the position to determine

5

whether it resembles a policymaker, a privy to confidential information, a communicator, or some other office holder whose function is such that party affiliation is an equally appropriate requirement." *Id.* at 142 (quoting *Jimenez Fuentes v. Torres Gaztambide*, 807 F.2d 236, 241-42 (1st Cir. 1986) (en banc)). For instance, in *Jenkins v. Medford*, we held that North Carolina deputy sheriffs were policymakers because they operated as "alter ego[s]" of the elected sheriff in implementing important public policies. 119 F.3d 1156, 1164 (4th Cir. 1997) (en banc).

B.

Borzilleri's complaint leaves no room for doubt: Baltimore City Assistant State's Attorneys are policymakers for First Amendment purposes.

Assistant prosecutors make discretionary decisions of real consequence. They oversee investigations, prosecute crimes, and negotiate plea deals. As the Supreme Court explained in *Branti*, prosecutors have "broader public responsibilities" beyond the mere representation of individual citizens. 445 U.S. at 519 n.13. They represent and safeguard the public at large. These responsibilities are laden with ideological content. How much of a prosecutor's limited resources should go toward a particular category of crime? Does one type of plea deal call for leniency or severity? Questions like these are debated in prosecutorial campaigns across the country. That is to say, there is much "room for political disagreement," *Stott*, 916 F.2d at 141, in carrying out prosecutorial priorities.

The contrasts between the prosecutorial responsibilities at issue in this case and the deputy clerk of court position considered in *Lawson v. Union County Clerk of Court*, 828 F.3d 239 (4th Cir. 2016), are instructive. In *Lawson*, we held that deputy clerks were

6

not policymakers because they were "generally responsible for administrative and ministerial tasks." *Id*. at 248. Any "particular political philosophy" was irrelevant to "overseeing case intake, receiving filing fees, collecting and disbursing funds from the child support account, and tracking and reporting court data." *Id*. By comparison, assistant prosecutors' tasks are far from ministerial. Be it investigations, charges, or pleas, ASAs exercise discretion on matters implicating "partisan political interests or concerns" on a daily basis. *Id*.

Elections mean something. Majorities bestow mandates. Elected prosecutors translate those mandates into policies. And assistant prosecutors implement those policies. It is therefore entirely proper for an electoral victor to assess whether she has confidence in those charged with fulfilling her "duty to the electorate and the public at large to ensure that [her] espoused policies are implemented." *Jenkins*, 119 F.3d at 1162. As *Jenkins* noted, "[s]ome candidates gain office by promising changes in current policy." *Id*. It may often be the case that those who served in the *ancien régime* are resistant to a change in the established way of doing things. To entrench former policymakers may, in such circumstances, deprive democratic politics of its necessary adaptability.

In Maryland, assistant prosecutors' authority to implement vital public policy is not just a matter of convenience or custom, but of state law. A State's Attorney has the power to prosecute "on the part of the State all cases in which the State may be interested," Md. Code Ann., Crim. Proc. § 15-102, and to "assign to his deputies and assistants . . . the duties required of him by law with respect to the institution and

7

prosecution of criminal actions," *State v. Aquilla*, 18 Md. App. 487, 494 (1973). This delegation even goes beyond that of the "alter-ego" sheriff's deputies in *Jenkins*. A Maryland State's Attorney can, unlike the sheriff, "delegate final responsibility for his official duties," *Jenkins*, 119 F.3d at 1163, to a subordinate. *See Aquilla*, 18 Md. App. at 494. As a matter of state law, then, ASAs "play a special role in implementing" a State's Attorney's "policies and goals." *Jenkins*, 119 F.3d at 1162.

Just as assistant prosecutors generally engage in politically charged decisionmaking, Borzilleri's "particular responsibilities" bore all the hallmarks of a "policymaker" and "communicator." *Stott*, 916 F.2d at 142. She made independent "charging decisions" and "plea offers" in major cases. Am. Compl. ¶¶ 6, 8. What is more, Borzilleri was one of just three "Community Prosecutors," who "prosecuted complex crimes and served as a liaison between the State's Attorney's Office, the community, and the local police." *Id.* at ¶ 5. In other words, Borzilleri was tasked with directly implementing the State's Attorney's policies and with communicating them to key constituents. It is hard to imagine a clearer example of a position that "resembles a policymaker" or "a communicator." *Stott*, 916 F.2d at 142.

Borzilleri contends that because assistant prosecutors are officers of the court, their position by its very nature constrains any policymaking authority that they possess. Appellant's Br. at 55. But while ASAs may be duty bound to conform to the rules of professional responsibility, that fact only constrains their discretion at the margins. Assistant prosecutors still make final decisions about whom to investigate, whom to charge, and what plea bargains to accept. The Baltimore City State's Attorney heads the

8

office to be sure. But she cannot possibly keep track of all the many individual decisions made by more than one hundred assistant prosecutors, not to mention whether those decisions reflect departmental policy. It is for that reason that the *Elrod-Branti* inquiry "focus[es] on the powers inherent in a given office, as opposed to the functions performed by a particular occupant of that office." *Stott*, 916 F.2d at 142.

In concluding that an assistant prosecutor occupies a policymaking position under *Elrod* and *Branti*, we join a unanimous chorus of courts of appeals to have considered the issue.[1] *See Simasko v. County of St. Clair*, 417 F.3d 559, 563 (6th Cir. 2005); *Aucoin v. Haney*, 306 F.3d 268, 276 (5th Cir. 2002); *Fazio v. City and County of San Francisco*, 125 F.3d 1328, 1334 (9th Cir. 1997); *Monks v. Marlinga*, 923 F.2d 423, 426 (6th Cir. 1991); *Livas v. Petka*, 711 F.2d 798, 800-01 (7th Cir. 1983); *Mummau v. Ranck*, 687 F.2d 9, 10 (3d Cir. 1982). Our sister circuits have not equivocated. As we do now, they have recognized that assistant prosecutors are "vested with broad discretionary powers" and "perform all the functions" of their elected superiors. *Aucoin*, 306 F.3d at 275, 276. Their "'client' is not an individual, but society as a whole," and they implement policies "necessary to protect the interests of that society." *Livas*, 711 F.2d at 800. Above all, "[t]he public interest in the efficient administration of justice requires that decisions made

---

[1] Borzilleri also appealed the district court's determination that Mosby possessed qualified immunity. Although we resolve this case on the merits, we briefly note that the fact that every court of appeals to consider the issue is in agreement casts serious doubt on Borzilleri's contention that Mosby's actions violated "clearly established" federal law. *See Pearson v. Callahan*, 555 U.S. 223, 243-44 (2009).

by such assistant prosecutors conform with the broad objectives chosen by the prosecutor." *Id.* at 801.

It is worth noting that federal courts should be chary of dictating how state officials carry out their responsibilities in an area so freighted with public importance. The Constitution can be a blunt instrument for micromanaging state civil service protections. There is thus no reason to impair the ability of states to enact statutory avenues of redress for Assistant State's Attorneys like those in the meticulously balanced federal civil service law. *See* 5 U.S.C. § 2302 (prohibiting "any personnel action" that discriminates on the basis of "political affiliation," but exempting from protection those positions with a "confidential, policy-determining, policy-making, or policy-advocating character"). Here, state courts possess concurrent jurisdiction over plaintiff's claims, and Borzilleri remains free to bring her surviving state law claims in the state system.[2] Our federal system often counsels restraint. And it is no abdication of our responsibilities in this case to avoid undue interference with the managerial prerogatives of an elected state official.

III.

---

[2] The district court did not abuse its discretion in dismissing with prejudice Borzilleri's intertwined state claim, or in dismissing without prejudice the non-intertwined state claims. *See White v. County of Newberry, S.C.*, 985 F.2d 168, 172 (4th Cir. 1993). It correctly concluded that Maryland courts interpret Article 40 *in pari materia* with the First Amendment to resolve Borzilleri's state free association claim. *See Borzilleri*, 189 F. Supp. 3d at 557; *Newell v. Runnels*, 407 Md. 578, 608 (2009). And the district court had "wide latitude in determining whether or not to retain jurisdiction over" the remaining non-intertwined claims. *Shanaghan v. Cahill*, 58 F.3d 106, 110 (4th Cir. 1995).

We next consider whether Borzilleri's firing constituted retaliation for expressing a political opinion in violation of her First Amendment right to free speech.

A.

The free speech protections afforded to public employees require balancing their interests as citizens "in commenting upon matters of public concern," *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968), the community's interest in hearing those employees' "informed opinions on important public issues." *City of San Diego v. Roe*, 543 U.S. 77, 82 (2004) (per curiam), and the government's interest "in promoting the efficiency of the public services it performs through its employees," *Pickering*, 391 U.S. at 568. The First Amendment protects a public employee's speech where the first two interests outweigh the third. *See Crouse v. Town of Moncks Corner*, 848 F.3d 576, 582-83 (4th Cir. 2017).

Before reaching that balancing inquiry, however, we must ask two threshold questions. First, we determine whether public employees' statements can "be fairly characterized as constituting speech on a matter of public concern." *Connick v. Myers*, 461 U.S. 138, 146 (1983). If not, no protection adheres. *Id.* Second, we ask whether public employees were speaking "pursuant to their official duties." *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006). If so, they were "not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.*

B.

11

Because the government possesses a strong interest in maintaining harmony between elected prosecutors and their policymaking subordinates, we conclude that Borzilleri's firing did not unconstitutionally burden her free speech.

The threshold inquiries are quickly resolved. Borzilleri spoke as a private citizen, not "pursuant to [her] official duties" as a prosecutor. *See Garcetti*, 547 U.S. at 421. And she opined on an election, perhaps the quintessential "matter of public concern." *Connick*, 461 U.S. at 146. There is no obstacle to reaching *Pickering* balancing here.

Although *Pickering* and its progeny are distinct from the *Elrod-Branti* line, our precedents have long recognized their close kinship. *See, e.g., McVey v. Stacy*, 157 F.3d 271, 278 (4th Cir. 1998) (noting that policymakers enjoy "substantially less" free speech protection and that "[t]his principle tends to merge with the established jurisprudence governing [free association and patronage dismissals]"). Once we have found that the *Elrod-Branti* policymaker exception applies, the *Pickering* balance generally tips in favor of the government because of its overriding interest in ensuring an elected official's ability to implement his policies through his subordinates. *See Rose v. Stephens*, 291 F.3d 917, 922 (6th Cir. 2002) (noting that *Pickering* balancing favors the government where the employee is a policymaker under *Elrod-Branti*); *Flynn v. City of Boston*, 140 F.3d 42, 47 (1st Cir. 1998) (same); *Rodriguez Rodriguez v. Munoz Munoz*, 808 F.2d 138, 144-45 (1st Cir. 1986) (same). Simply put, where an employer "does not violate his employee's association rights by terminating him for political disloyalty, the employer also does not violate his employee's free speech rights by terminating him for *speech* displaying that political disloyalty." *Bland v. Roberts*, 730 F.3d 368, 394 (4th Cir. 2013).

12

We see no reason to depart from that conclusion here, especially where an employee has vigorously campaigned against the election of the very person who became her boss. If we were to strike the *Pickering* balance differently, any assistant prosecutor facing a patronage dismissal permitted by *Elrod-Branti* could attempt to shield himself behind *Pickering* by publicly criticizing his newly elected superior. Our First Amendment jurisprudence would then have become self-defeating.

IV.

For the foregoing reasons, the judgment of the district court is

*AFFIRMED.*