EDITH H. JONES, Circuit Judge:
A newly elected Hidalgo County, Texas district attorney, Ricardo Rodriguez, defeated the longtime incumbent and subsequently fired seven Plaintiff employees who worked in the DA's office. The Plaintiffs allege that Rodriguez fired them because they supported his political opponent, Rene Guerra. Rodriguez sought *390 summary judgment pertaining to his qualified immunity, but the district court found material factual issues and held that qualified immunity offered no protection. Because we conclude that Rodriguez is entitled to qualified immunity as to four of the Plaintiffs but that genuine disputes of material fact exist as to the other three, we REVERSE in part and DISMISS in part.
BACKGROUND
In the 2014 Democratic primary election for Hidalgo County District Attorney, the Defendant Ricardo Rodriguez defeated Rene Guerra, the longtime DA. Rodriguez ran unopposed in the general election and assumed office on January 1, 2015. Rodriguez thus took charge of overseeing more than 150 employees in the DA's office. Shortly after taking office, Rodriguez fired the seven Plaintiff employees.
Three of the Plaintiffs worked in the Hidalgo County High Intensity Drug Trafficking Area Task Force ("HIDTA"). HIDTA is "a consolidated group of investigators made up of federal, state, and local law enforcement agents." Those Plaintiffs are Dora Munoz, the HIDTA commander, Chris Yates, the HIDTA Assistant Commander, and Palmira Munoz, HIDTA's intelligence research specialist. Dora and Palmira Munoz are sisters.
The four other fired Plaintiff-employees include two criminal investigators, Jorge Salazar and Santos Leal, as well as Rogelio Cazares, the DA's office Human Resources Coordinator, and Dora Maldonado, an administrative assistant.
Dora Munoz was fired on January 2, the day after Rodriguez took office. Yates, Palmira Munoz, and Leal were all fired on January 8. Cazares was fired on January 28, Salazar on March 11, and Maldonado on August 8.
All of the Plaintiffs openly supported Guerra in the election and campaigned for him. Their campaign activities included posting yard signs, wearing campaign T-shirts publicly, block-walking, attending Guerra's campaign kick-off party, volunteering at polling stations, and posting pictures of themselves wearing Guerra T-shirts on social media. In short, all of the Plaintiffs campaigned against Rodriguez in some way or another.
The Plaintiffs sued Rodriguez in both his individual and official capacities under 42 U.S.C. § 1983, alleging that he fired them as an act of political retaliation violating the First Amendment. Considerable discovery ensued. Rodriguez moved for summary judgment on the basis of qualified immunity. In a thorough and careful 35-page opinion, the district court denied summary judgment on both the individual and official capacity claims. Rodriguez now appeals.
STANDARD OF REVIEW
"The denial of a motion for summary judgment based on qualified immunity is immediately appealable under the collateral order doctrine to the extent that it turns on an issue of law." Melton v. Phillips , 875 F.3d 256, 261 (5th Cir. 2017) (en banc) (quotation marks and internal citations omitted). "The Fifth Circuit reviews the denial of qualified immunity de novo ." Gentry v. Lowndes County, Miss. , 337 F.3d 481, 484 (5th Cir. 2003).
Summary judgment is appropriate if there is no genuine issue of material fact and if the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). At this juncture, all facts in evidence are viewed in the light most favorable to the non-movants. And in qualified immunity appeals, this court may consider the materiality of an alleged fact issue as akin to a matter of law but may not review the *391 genuineness of the factual dispute. Melton , 875 F.3d at 261. When the defense of qualified immunity is raised, a plaintiff must point to evidence creating material fact disputes as to whether a defendant has violated clearly established law. Id.
DISCUSSION
On appeal, Rodriguez makes three significant arguments. He spends most of his briefing on the contention that the Plaintiffs have not created fact issues that he even knew of the political activity of all but two of them, nor that he caused any of their dismissals as political payback. Second, he argues that because the Plaintiffs served in policymaking or confidential roles in the office, the applicable First Amendment balancing tests weigh in favor of the need for their political loyalty and thus support his authority to fire them for supporting the opposing candidate. Third, Rodriguez asserts qualified immunity because the law was not clearly established that he could not fire the Plaintiffs.[1]
Rodriguez defends his position in a curious way. He denies his knowledge of most of the Plaintiffs' political activity and denies any intent to fire them in retaliation, but alternatively he contends he had a constitutional right to do so, or at least had qualified immunity for the decisions. In deposition, however, he acknowledged, as the district court noted, that no one "[has] to be a political supporter of Ricardo Rodriguez" to do his or her job in the DA's office. And he claimed not to have known the political preferences of his First Assistant DA or his chosen HIDTA Commander Juan Delgado to whom he delegated authority to replace several of the Plaintiffs.
One reason for Rodriguez's adoption of alternative, self-contradictory positions is the existence of material fact disputes concerning the threshold inquiries in this First Amendment retaliation case. A First Amendment political retaliation claim requires proof that a plaintiff (a) suffered an adverse employment action (b) because of (c) his "speech or activity related to a matter of public concern." Aucoin v. Haney , 306 F.3d 268, 274 (5th Cir. 2002). "Once the plaintiff demonstrates a matter of public concern, the employer must then establish that its interest in promoting the efficiency of the services provided by its employees outweighs the employee's interest in engaging in the protected activity." Id. ; see Haverda v. Hays County , 723 F.3d 586, 591-92 (5th Cir. 2013) ; Gentry , 337 F.3d at 485-86 ; Aucoin , 306 F.3d at 273-74 ; Vojvodich v. Lopez , 48 F.3d 879, 887 (5th Cir. 1995).
Here, there is no dispute that the Plaintiffs engaged in political activity against Rodriguez, and they were fired by or with the approval of the new DA. Of course, "campaigning for a political candidate relates to a matter of public concern." Aucoin , 306 F.3d at 274. We need not recite the voluminous record evidence, carefully assessed by the district court, that demonstrates material fact issues about Rodriguez's knowledge of each of the Plaintiffs' participation in the election and "on the ultimate question [ ] whether each Plaintiff's political support for Guerra motivated Rodriguez's decisions to terminate their employment." Accordingly, this court may not reach the disputed causation issues as a matter of summary judgment review. Haverda , 723 F.3d at 595-96 *392 ("Courts deciding the causation issues by summary disposition have generally done so only when the employer's reasons have not been controverted.").
The ultimate issue thus requires balancing of the Plaintiffs' First Amendment right to participate in political activity against the legitimate needs of the employer, here, the DA's office, to provide efficient public service. This court's decisions have melded the Supreme Court's discussion of these principles in Branti v. Finkel , 445 U.S. 507, 517-20, 100 S. Ct. 1287, 1294-95, 63 L.Ed.2d 574 (1980), with the broader but similar Pickering - Connick test.[2] The result is that "[t]his circuit, interpreting the Court's decisions, places cases involving only political association, only speech, or a combination of the two on a spectrum." Kinsey v. Salado Indep. Sch. Dist., 950 F.2d 988, 993-94 (5th Cir. 1992) (en banc) (citing McBee v. Hogg County, 730 F.2d 1009, 1014 (5th Cir. 1984) ). "Where nonpolicymaking, nonconfidential employees are discharged solely because of their private political views, little, if any weighing of an employee's First Amendment rights against an employer's right to loyal and efficient service is necessary, and the employee's rights will usually prevail. On the opposite end of the spectrum, however, are cases where employees' exercise of First Amendment privileges clearly over-balanced [their] usefulness." Gentry, 337 F.3d at 485-86 (citing Kinsey, 950 F.2d at 993-94 ) (quotation marks and internal citations omitted) (footnote omitted). Gentry adds that "where a public employee ... occupies a confidential or policymaking role, the employer's interests more easily outweigh the employee's First Amendment rights." Id. at 486. The balancing test is case-specific.
Rodriguez contends that each of the Plaintiffs he fired held policymaking or confidential positions for which his trust in their loyalty was required. There are no cases on point, but this court's past decisions describe the general parameters of such employment.
In Aucoin, for instance, this court held, in line with other circuits, that assistant district attorneys "occupy positions requiring political loyalty and are not protected from political dismissals under the First Amendment." 306 F.3d at 275 ; see, e.g., Borzilleri v. Mosby, 874 F.3d 187, 193 (4th Cir. 2017) (listing cases). Generally, "policymakers may be public employees whose responsibilities require more than simple ministerial competence, whose decisions create or implement policy, and whose discretion in performing duties or in selecting duties to perform is not severely limited by statute, regulation, or policy determinations made by supervisors." Aucoin , 306 F.3d at 273 (quotation marks and citation omitted). In addition, "[a] policymaker also may be an individual who controls or exercises a role in a decision making process as to the goals and general operating procedures of [an] office." Id. (quotation marks and citation omitted). But as the court noted, "[i]n Branti, the [Supreme] Court explained that 'the ultimate inquiry is not whether the label 'policymaker' or 'confidential' fits a particular position; rather, the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for effective performance of the public office involved.' " Id. (quoting Branti, 445 U.S. at 518, 100 S. Ct. at 1295 ).
Two other cases juxtapose positions within the same county that were, respectively, held to require or not require political loyalty, with the result that the political *393 officials, respectively, could or could not terminate employees for their political activity. Compare Gentry, 337 F.3d at 487-88 (county road manager, second highest non-elected county management position, may be fired for political opposition), with Wiggins v. Lowndes County, Miss., 363 F.3d 387, 391-92 (5th Cir. 2004) (county road foreman simply implements policy and may not be terminated for political reasons). Wiggins added to the previous descriptions that "[a]n employee is confidential if he or she stands in a confidential relationship to the policymaking process, e.g., as an advisor to a policymaker, or if he or she has access to confidential documents or other materials that embody policymaking deliberations and determinations, e.g., as a private secretary to a policymaker." Wiggins , 363 F.3d at 391 (quotation marks and citation omitted).
In a series of cases, this court has applied the Branti / Pickering / Connick balancing test and concluded that the politically-motivated demotions or terminations of Texas Deputy Sheriffs by a newly elected Sheriff were actions not only afoul of the First Amendment but, as of 1993, so "clearly established" as to negate the defense of qualified immunity.[3] More pointedly, the court stated that "by January 1992 at the latest," it was clearly established that "a public employer cannot act against an employee because of the employee's affiliation or support of a rival candidate unless the employee's activities in some way adversely affect the government's ability to provide services." Vojvodich , 48 F.3d at 887. But this court explained in Gentry that "[t]he deputy sheriff cases are distinguishable from our other dismissal cases either because they do not hold policymaking or confidential positions ... or because the sheriffs [did] not allege that the deputies' political activities actually or potentially could affect the Sheriff's Office ability to provide services." 337 F.3d at 487 n. 5.[4]
More relevant is this court's decision in Gunaca v. State of Texas , not because the court ruled definitively on whether an investigator in the DA's office in El Paso had First Amendment protection from political termination but instead because the court did not so rule. 65 F.3d 467, 474-75 (5th Cir. 1995). The court granted qualified immunity, expressly because
[t]he right that Gunaca asserts in his complaint and summary judgment response was not clearly established at the time Esparza allegedly violated it because neither the Fifth Circuit nor the Supreme Court had addressed the issue of political patronage in the hiring or firing of investigators in district attorneys' offices, and neither had addressed an issue sufficiently analogous that a reasonable official would understand from its resolution that it is a First Amendment violation to dismiss or to not hire an investigator on the grounds that the investigator supported the campaign of the official's opponent.
Gunaca, 65 F.3d at 475.[5] Gunaca relied on a previous Fifth Circuit decision, which emphasized that in considering First *394 Amendment claims that require the balancing of personal rights and the public interest in an efficient and disciplined workplace, " '[t]here will rarely be a basis for a priori judgment that the termination or discipline of a public employee violated 'clearly established' constitutional rights.' " Gunaca, 65 F.3d at 474 (quoting Noyola v. Texas Dept. of Hum. Res., 846 F.2d 1021, 1026 (5th Cir. 1988) ).
Put together, this court's case law strongly suggests that certain employees in the District Attorney's office, in addition to assistant DAs, must be terminable for their political activity to the extent they have significant discretion or input into deciding which kinds of crime to pursue with limited resources, which cases to pursue, how to conduct investigations, executions of warrants and arrests, and whether to recommend lenient or severe punishments. The point is made in Borzilleri that the prosecutorial function of the District Attorney is "laden with ideological content," which is the subject of public debate and electoral choices. 874 F.3d at 191 ; see also Aucoin, 306 F.3d at 275-76. Once the DA is selected, the office must be sensitive to that official's policy demands as represented to the voters. And the DA is ultimately responsible for every interaction between his office and the public.
The political sensitivity of DA offices is reinforced in Texas law by statutory provisions that enable the DA to hire all "office personnel" "required for the proper and efficient operation and administration of the office;" render all such personnel "subject to removal at will;" and render investigators "under the exclusive authority and direction of the prosecuting attorney." See Tex. Gov't. Code §§ 41.102, 41.105, and 41.109(b).
Whether the political sensitivity of the prosecutorial function inherently requires political trust and loyalty throughout the DA's office remains unsettled,[6] but Gunaca' s twenty-four-year-old precedent affording qualified immunity to the DA who fired an investigator has not been altered. Nor has the scope of First Amendment protection for employees of a DA's office become "clearly established" in the interim. Pending further development of the law concerning DA employees other than attorneys, we must take Gunaca to furnish a baseline at least for granting qualified immunity. If an investigator's position was sufficiently significant to possibly deny the employee First Amendment protection from retaliation, and therefore to afford the DA qualified immunity, then surely the DA must receive qualified immunity for firing personnel above the investigator's level in the chain of command.
*395 Using Gunaca as a baseline, on the record before us, there is no material fact dispute that the former HIDTA Task Force Commander and her Assistant, Dora Munoz and Yates, although perhaps not as intimately connected with the DA's duties as assistant prosecutors, held more responsible and discretionary positions than ordinary investigators. Indeed, they can be fairly characterized as criminal investigators with substantial additional responsibility.[7] Even if we were to define their positions as entitled to First Amendment protection from political retaliation, a decision we need not make in light of Pearson v. Callahan,[8] Rodriguez would be entitled to immunity pursuant to Gunaca. And because of Gunaca, we are constrained to conclude that Rodriguez may claim qualified immunity for firing the Hidalgo County investigators Salazar and Leal, who held positions identical to that of Gunaca himself. As a matter of law, these four individuals' claims are defeated by the DA's qualified immunity.
The status of First Amendment protection for the other Plaintiffs, however, is not settled by Gunaca. They are the former Human Resources Coordinator Cazares, HIDTA intelligence research specialist Palmira Munoz, and administrative assistant Maldonado. To determine whether Rodriguez is entitled to qualified immunity, the court must determine whether he violated their First Amendment rights under the Branti / Pickering / Connick balancing test, and whether that right was clearly established at the time of the conduct. Haverda , 723 F.3d at 598.[9] See Vojvodich , 48 F.3d at 885 ("[B]ecause of the wide variety of situations in which this issue might arise, each case should be considered on its particular facts."). However, the evidence regarding these Plaintiffs' job descriptions is heavily contradictory, and genuine disputes of material fact exist regarding whether they can be fairly characterized as policymakers or confidential employees. Consequently, we must dismiss Rodriguez's appeal as to Cazares, Palmira *396 Munoz, and Maldonado. See Melton , 875 F.3d at 261 ("[W]e lack jurisdiction to review the genuineness of a fact issue but have jurisdiction insofar as the interlocutory appeal challenges the materiality of [the] factual issues.") (emphasis in original).
Juan Villescas, Rodriguez's First Assistant DA, testified that Cazares held a high-level position. According to Villescas, Cazares was the CFO of the DA's office, whose duties included "creating and implementing employee policies," and advising the DA on the office's $8 million annual operating budget. Villescas testified that the HR coordinator is part of the "inner circle who serves as a close advisor to Rodriguez, meeting with him on at least a weekly basis, sometimes daily, to make recommendations on personnel and financial matters, to help set priorities and goals of the DA office."
Cazares, however, contradicts these statements. He asserts that "I was certainly not the chief financial officer of the District Attorney's office as Juan Villescas claims." "I was never treated by Mr. Guerra or anyone else at the DA's office as one of the 'key personnel' at the DA's office. I was rarely included in brainstorming sessions with Mr. Guerra, about the policies of the office, or changes in focus - those are the conversations that, the participants told me, occurred with his First Assistant, Mr. Vasquez, and the Chiefs of the various divisions - all of whom were lawyers." He explains that he and Guerra "never met about policies for the District Attorney's office and he never consulted with me about any policies. Nor did he ever ask for my advice when it came to employees or the budget. I did not have any meetings with Rodriguez along those lines. There is no way anyone could have reasonably concluded that I was in any way part of Mr. Guerra's 'inner circle' or that I was his 'close advisor.' Neither of those assertions are true, and anyone who observed us would have known that." Finally, although Cazares was the HR coordinator, "[u]nder Guerra, hiring and firing decisions were left to the Department Head for staff, or staff supervisor ... or Rene Guerra for Assistant District Attorneys."
Juan Sifuentes, Rodriguez's current HIDTA Commander, testified that Palmira Munoz held a key position. According to Sifuentes, "Palmira Munoz had a confidential relationship to the policymaking process, because her work drove HIDTA investigations. Palmira Munoz was the key advisor for HIDTA to Rene Guerra, the HIDTA Commander, and Assistant Commander."
Guerra disagrees with that description because "[s]he was certainly not a key advisor to me. As much as I respected Palmira for her work ethic, her position was nothing more than a glorified secretary. Pam would take information or reports that were given to her by the HIDTA agents and analyze information and prepare a summary. ... She basically just processed information, never actually ran or conducted an intelligence operation." Palmira Munoz also asserted that "[a]bsent in my job description is any duty or responsibility for creating policy. That was not part of my job, either officially or unofficially. In fact, while I was intelligence analyst ... Guerra never told me or asked me to create or draft any policies for him, or to help him or anyone else do so - and I was never involved in creating any policies." "I was also not a close advisor to ... Guerra."
Finally, Maldonado was an administrative assistant under an Assistant District Attorney. She was responsible for making sure motions and pleadings were filed properly. She testified that, "[t]here is nothing 'highly confidential' in the DA's *397 files that I was privy to. Anyone at the DA's office who wanted to look through the files that I had access to could also look through them." She concludes that, "[a]ll in all, my duties were mostly ministerial, involving reception work and data entry for most of the day." Villescas, however, asserts that she "had access to and use of confidential documents and information, including investigative files."
These genuine factual disputes speak directly to whether Cazares, Palmira Munoz, and Maldonado were policymakers or confidential employees. Further, Gunaca is inapposite to these three Plaintiffs because they were not criminal investigators and their precise position in the DA's office chain of command is uncertain. We lack jurisdiction to review their claims. Melton , 875 F.3d at 261.
CONCLUSION
The judgment of the district court as to the individual capacity claims of Dora Munoz, Chris Yates, Jorge Salazar, and Santos Leal is REVERSED on account of Rodriguez's qualified immunity. The appeal as to the individual capacity claims of Dora Maldonado, Palmira Munoz, and Rogelio Cazares is DISMISSED , and the case is remanded for further proceedings consistent with this opinion.
REVERSED IN PART, DISMISSED IN PART.
JAMES L. DENNIS, Circuit Judge, dissenting in part:
The district court denied district attorney Ricardo Rodriguez, of Hidalgo County, Texas, summary judgment on his claim of entitlement to qualified immunity for the termination of seven employees who supported his opponent in the preceding election. The district court identified countless issues of fact that, when viewed in the light most favorable to the plaintiffs, demonstrated that Rodriguez violated clearly established law in terminating these seven employees. The majority correctly holds that we lack jurisdiction to disturb this ruling as to three of the seven plaintiffs due to the well-established principle that we have appellate jurisdiction only over pure legal questions when reviewing an interlocutory order denying qualified immunity at the summary judgment stage. However, with respect to the four plaintiffs who served in various investigator roles, the majority flouts this jurisdictional limitation, improperly reassessing the district court's reasoned judgment that each plaintiff submitted sufficient evidence to survive summary judgment. Equally egregious, the majority does so in a case where this Circuit's case law clearly establishes that Rodriguez's termination of the four plaintiffs in investigator roles violated the First Amendment.
For these reasons, I respectfully dissent from the majority's partial reversal and would instead dismiss the appeal in full.
I
Plaintiffs in this civil rights action are former employees of the Hidalgo County District Attorney's office, all of whom were terminated after Rodriguez, the new district attorney, was elected. Plaintiffs actively campaigned for the new DA's opponent, the incumbent for the office, in the Democratic primary. Plaintiffs engaged in typical political speech during the election: they posted yard signs, wore campaign T-shirts in public, canvassed neighborhoods, attended campaign events, volunteered at polling stations, and posted on social media. Four of the seven plaintiffs were employed as criminal investigators in the DA's office: Dora Munoz was the commander of the Hidalgo County High Intensity Drug Trafficking Area Task Force *398 ("HIDTA"), a group of investigators including federal, state, and local agents; Chris Yates was the HIDTA Assistant Commander; and Jorge Salazar and Santos Leal were criminal investigators (collectively, the "Investigator-Plaintiffs"). The three other plaintiffs were a HIDTA research specialist, a human resources coordinator, and an administrative assistant (together with the Investigator-Plaintiffs, "Plaintiffs"). Rodriguez fired four of the seven plaintiffs within a week of taking office, including three of the Investigator-Plaintiffs. He fired another in the first month, and the remaining two, including the fourth Investigator-Plaintiff, later that year.
"To determine whether qualified immunity applies, [we] engage[ ] in a two-part inquiry asking: first, whether '[t]aken in the light most favorable to the party asserting the injury, ... the facts alleged show the officer's conduct violated a constitutional right;' and second, 'whether the right was clearly established.' " Trammell v. Fruge , 868 F.3d 332, 339 (5th Cir. 2017) (quoting Saucier v. Katz , 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) ). To make out a violation of the First Amendment on the basis of retaliation under the first prong, Plaintiffs must demonstrate four elements: "(1) the plaintiff suffered an adverse employment decision, (2) the plaintiff's speech involved a matter of public concern, (3) the plaintiff's interest in speaking outweighed the governmental defendant's interest in promoting efficiency, and (4) the protected speech motivated the defendant's conduct."[1] Kinney v. Weaver , 367 F.3d 337, 356 (5th Cir. 2004). Then, under the second qualified immunity prong, we must ask whether, in balancing the plaintiff's interest in speaking against the governmental defendant's legitimate interests, the defendant's "conduct [was] sufficiently clear that [he] can fairly be said to have been on notice of the impropriety of [his] actions," even though "reasonable officials might not always be able to predict the outcome of a balancing test." Id. at 371-72.
The district court concluded that genuine issues of material fact existed as to each of the four elements of Plaintiffs' First Amendment retaliation case, and that, taking the facts in the light most favorable to the Plaintiffs, Rodriguez's conduct violated clearly established First Amendment law. As to the clearly-established prong of the qualified immunity analysis, the district court held that "the law was clearly established that the First Amendment protected their political support for [Rodriguez's opponent] unless their activities in some way adversely affected the ability of the DA's Office to provide services, and at this stage of the case, the record contains no evidence of such disruption." Rodriguez appealed this interlocutory order, asking us to reverse the district court's finding of qualified immunity.
In the context of appeals from denials of qualified immunity at the summary judgment stage, special limitations on our jurisdiction inform our review. We lack jurisdiction to review the district court's determinations of whether "a genuine issue *399 of fact exists regarding whether the defendant(s) did, in fact, engage in" objectively unreasonable, unlawful conduct. Kinney , 367 F.3d at 346. "Stated differently, in an interlocutory appeal [this court] cannot challenge the district court's assessments regarding the sufficiency of the evidence-that is, the question whether there is enough evidence in the record for a jury to conclude that certain facts are true." Id. at 347. Furthermore, this court "need not consider the correctness of the plaintiff's version of the facts, nor even determine whether the plaintiff's allegations actually state a claim." Mitchell v. Forsyth , 472 U.S. 511, 528, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). The basic inquiry in which we are constrained to engage asks only "whether the district court erred in assessing the legal significance of the conduct that the district court deemed sufficiently supported for purposes of summary judgment," accepting the plaintiffs' version of any factual disputes as true. Juarez v. Aguilar , 666 F.3d 325, 331 (5th Cir. 2011) (cleaned up).
The majority is faithful to the precepts with respect to three of the seven plaintiffs, finding issues of fact deprive us of jurisdiction to review the denial of qualified immunity. However, with respect to the Investigator-Plaintiffs, the majority holds that it was not sufficiently clear, based on the clearly established law at the time of their terminations, that the Investigator-Plaintiffs were protected from politically motivated termination under the First Amendment. See supra at 394-95. The majority errs in so holding.
II
In concluding that whether the Investigator-Plaintiffs are protected by the First Amendment from political retaliation is not clearly established, the majority relies heavily on Gunaca v. State of Texas , 65 F.3d 467, 468 (5th Cir. 1995), in which this court granted qualified immunity for the termination of Dempsey Gunaca "as an investigator at the El Paso County District Attorney's Office." Problematically, however, this interpretation overlooks that this court in Gunaca found a constitutional violation under the first prong of qualified immunity and therefore clearly established that First Amendment protection from termination can extend to investigators in DA's offices for future cases. See Gunaca , 65 F.3d at 473-74 (in "first determin[ing] whether Gunaca has alleged a violation of a constitutional right," concluding that "Gunaca has at least alleged a violation of his constitutional rights"). The Supreme Court has endorsed the process of determining whether a constitutional violation exists before deciding whether the law was clearly established, as this "two-step procedure promotes the development of constitutional precedent and is especially valuable with respect to questions that do not frequently arise in cases in which a qualified immunity defense is unavailable." Pearson v. Callahan , 555 U.S. 223, 236, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). The Gunaca panel engaged precisely in this two-step procedure, establishing for future cases, such as this one, that investigators in DA's offices are generally protected from political termination. This result is especially pronounced with respect to the non-HIDTA investigators, who the majority notes "held positions identical to that of Gunaca himself." Supra at 395. I cannot see how Gunaca 's holding that a violation existed there could function in any manner other than to compel us to find here that the law on this point is clearly established in favor of all of the investigator-plaintiffs.
III
The foregoing analysis resolves this case. But even if it did not, the majority *400 would still be wrong in reversing the district court's finding that Rodriguez was not entitled to qualified immunity with respect to his termination of the Investigator-Plaintiffs. First, I believe the majority misinterprets not only Gunaca but also several other qualified immunity precedents that support finding that the violations here were clearly established. Second, in couching its analysis in terms of legal issues, such as interpreting Gunaca and other qualified immunity cases, the majority ignores the fact disputes in the record for each investigator-plaintiff and the district court's determination that those disputes were genuine. These genuine fact disputes preclude us from reversing given our limited jurisdiction at this stage.
A
As already discussed, perhaps the most fundamental error in the majority's reasoning is its misreading of Gunaca , which merely held that the plaintiff's rights in that case were not clearly established at the time, but itself established that investigators in DA's offices are protected by the First Amendment from politically motivated terminations. The majority also wrongly relies on the statement in Gunaca that " '[t]here will rarely be a basis for a priori judgment that the termination or discipline of a public employee violated "clearly established" constitutional rights.' " Gunaca, 65 F.3d at 474 ; see supra at 394-95. That statement has been significantly undermined by our en banc precedent in Kinney v. Weaver , 367 F.3d 337 (5th Cir. 2004), which noted that "[w]e do not think that this remark can be taken to set forth a rule of law to the effect that qualified immunity is mandated in [First Amendment retaliation balancing test] cases." Kinney , 367 F.3d at 371 n.41. According to the en banc court, to the extent this language is a prediction of future success of these lawsuits under the qualified immunity rubric, it "does not purport to command a particular result." Id. It is also unhelpful to rely too heavily on Gunaca 's "prediction" about the clearly established nature of rights in this area given the different procedural posture of this case. Here, unlike in Gunaca , we are reviewing a denial of summary judgment, such that "our factual guide is the district court's view of the record, and the legal question is whether the defendants' conduct violated clearly established law measured against the facts that the district court believed the plaintiffs could prove at trial." Kinney , 367 F.3d at 367 (cleaned up).
Moreover, the majority wrongly discounts the import and applicability of Vojvodich v. Lopez , 48 F.3d 879, 885 (5th Cir. 1995), and other Fifth Circuit cases involving the termination of deputy sheriffs.[2] In Vojvodich , this court held that: (1) "[a]s far back as 1985, the established law in this circuit has been that a public employer cannot retaliate against an employee for expression protected by the First Amendment merely because of that employee's status as a policymaker," (2) "by January 1992 at the latest, the law was equally *401 clear that, regardless of whether an employee is a policymaker, a public employer cannot act against an employee because of the employee's affiliation or support of a rival candidate unless the employee's activities in some way adversely affect the government's ability to provide services," and (3) "prior to March 1993, it should have been readily apparent to a reasonable sheriff that he could not retaliate against a policymaking deputy for exercising his First Amendment rights unless the deputy's activities had in some way disrupted the sheriff's department." 48 F.3d at 886-87. These holdings in Vojvodich demonstrate the correctness of the district court's determination that "at the time Rodriguez made the challenged decisions to terminate Plaintiffs' employment, the law was clearly established that the First Amendment protected their political support for [Rodriguez's opponent] unless their activities in some way adversely affected the ability of the DA's Office to provide services."
The majority attempts to distinguish these cases involving termination of deputy sheriffs by noting that, in Gentry v. Lowndes County , a panel of this court stated that "[t]he deputy sheriff cases are distinguishable ... because they do not hold policymaking or confidential positions ... or because the sheriffs do not allege that the deputies' political activities actually or potentially could affect the Sheriffs Office's ability to provide services." 337 F.3d 481, 487 n.8 (5th Cir. 2003) ; Supra at 393. The fact that the sheriff cases were distinguishable in Gentry does not make them so here. Here, we are required to accept the plaintiffs' version of the facts for purposes of analyzing whether a violation of clearly established law occurred, which means that, for our purposes, Investigator-Plaintiffs were nonconfidential, nonpolicymaking employees.[3] See Kinney , 367 F.3d at 367. Accordingly, there is simply no meaningful distinction from Vojvodich and the other deputy sheriff cases that reiterate the clearly established law in this area.[4]
The relevant question, which the majority fails to ask, is instead whether it was sufficiently clear at the time of the violation that the elements of plaintiffs' First Amendment retaliation claim were met under the facts laid out by the district court. See Juarez v. Aguilar , 666 F.3d 325, 336 (5th Cir. 2011) ("Assuming [employee's] allegations are true ... such conduct would fall well within the clearly established elements of retaliation in violation of [employee's] First Amendment rights." (emphasis added)). Investigator-Plaintiffs have made that showing, as correctly determined by the district court.
The majority's contrary conclusion-that Investigator-Plaintiffs' First Amendment rights somehow remain unclear under the First Amendment balancing test-runs afoul not only of the precedents discussed above, but also the en banc court's holdings in Kinney v. Weaver . There, the court held that "[a]lthough we are sensitive to the fact that reasonable officials might not always be able to predict the outcome of a balancing test," the defendants' "conduct is sufficiently clear that they can fairly be *402 said to have been on notice of the impropriety of their actions" because "given the factual disputes identified by the district court and taking the plaintiffs' side of those disputes, this case does not require any real balancing at all, for the [defendants] do not have any relevant, legitimate interests to put on their side of the ... scales." Kinney , 367 F.3d at 371-72. The same result should obtain here. As discussed in the following section, fact disputes exist as to each Investigator-Plaintiffs' status as policymaking or confidential employees, and, taking their side of each dispute, it is abundantly clear that "this case does not require any real balancing at all." Id. at 372 ; see also Gentry , 337 F.3d at 486 ("Where nonpolicymaking, nonconfidential employees are discharged solely because of their private political views, little, if any weighing of an employee's First Amendment rights against an employer's right to loyal and efficient service is necessary ....").
B
The remainder of the majority opinion reveals its own inconsistency in treating some fact issues-those regarding non-investigative employees-as precluding our jurisdiction while simply ignoring this jurisdictional bar as to the Investigator-Plaintiffs.
HIDTA Task Force Commander Dora Munoz and Assistant Commander Chris Yates as holding "more responsible and discretionary positions than ordinary investigators" and as "fairly characterized as criminal investigators with substantial additional responsibility." Supra at 395. The only evidentiary support the majority cites for these statements, in a footnote, is Munoz's and Yates's job descriptions, which discuss "executive management authority" and "operational plans." See id. at n.7. Problematically, however, we lack jurisdiction to weigh this evidence in favor of Rodriguez, because the accuracy of these descriptions was disputed. In fact, the district court explicitly recognized this dispute, referring to these job descriptions as among the evidence presented in support of the defendants' "attempt to describe how each Plaintiff's job bears the hallmarks of a policymaking or confidential position." However, as the district court pointed out, "Plaintiffs dispute these characterizations with their own evidence." Later in this same paragraph, the district court concludes that "this highly fact intensive decision involving, amongst other things, determinations of witness credibility is best left to a jury to decide." The district court thus identified this evidence as in dispute, such that we lack jurisdiction to rely on the defendants' version of this evidence. See Kinney , 367 F.3d at 348.
The majority appears to recognize this dispute, but brushes past it, stating that the former DA's testimony, which the district court explicitly identified as one piece of the plaintiffs' controverting evidence, "does not detract from the importance of [Munoz's and Yates's] management positions or the new DA's intention, confirmed by Texas law, to rely on the HIDTA Commander and Assistant as employees from whom he expected wholehearted trust and loyalty." Supra at n.7. But the facts relied on for this statement are also disputed: The replacement HIDTA Commander under Rodriguez testified that he was not required to give political allegiance to Rodriguez in order to meet the requirements of his job. The majority is thus improperly resolving these factual disputes in defendants' favor, which "[o]ur limited jurisdiction prevents us from doing." Juarez v. Aguilar , 666 F.3d 325, 332 (5th Cir. 2011).
Contrary to the job description the majority erroneously accepted as true, see supra at n.7, Dora Munoz submitted a *403 declaration averring that "[a]s Hidalgo County HIDTA Commander, I had no discretion nor decision-making authority to formulate policy. Policy came from the Executive Office of the President Office of National Drug Control Policy, who set national policy goals and directives, and from the Mission Statement approved by the South Texas HIDTA Region." The former district attorney Rene Guerra also testified that "[n]either Dora nor Chris EVER created policy or even advised me on any policy-making decisions. Although I respected both Dora and Chris, neither one of them was a close advisor or confidant." He also testified that the contention "that Dora Munoz enjoyed a broad grant of authority and discretion in the management of HIDTA affairs and that she used this authority to create ... agency policies and procedures to be observed by HIDTA agents," was "absolutely untrue."
Fact issues similarly exist as to Chris Yates's job duties. Yates testified that "[a]bsent in my job description is any duty or responsibility for creating policy. That was not part of my job, either officially or unofficially. In fact, while I was assistant commander, the district attorney Rene Guerra never told me or asked me to create or draft any policies for him, or to help him or anyone else do so - and I was never involved in creating any policies. In addition, I did not discuss with Rene Guerra confidential policy information or advise Rene Guerra about policy. My job did not have a policy making aspect to it. My job required the implementation of policy which was set out by the Office of the President Office of National Drug Control Policy through the South Texas HIDTA Board." Guerra's testimony reinforces this version of the facts because he testified that Yates never "created policy or even advised [him] on any policy-making decisions."
Leal and Salazar, both investigators, also testified about their lack of policymaking or confidential duties. Leal testified that "[t]here was little discretion to what I did and none of it involved politics. My job duties were ministerial in nature. Mostly all I did was review files. And these files were not 'highly confidential.' They just contained the basic facts about an investigation. The local law enforcement agency prepared the report and that report was available to everyone in that agency as well as anyone in the DA's office who wanted to look at it." Leal further stated that "I was not an employee whose decisions created or implemented policies. I never met with Rene Guerra to discuss ANY kind of policy, nor did he ever seek my advice on any policy matters. In fact, I can't recall meeting with Guerra on any particular occasion other than he would stop by the office just to say hello." Salazar's testimony was similar, stating that "I did not create any policies, I just followed procedures set out by the DA's office and the law, which I was required to do. I did not brainstorm with the DA about the overall office operations, or about politics or policies. My job duties were ministerial in nature. During my 9 ½ years at the DA's office, I met with Rene Guerra only occasionally, and then it was only to discuss an ongoing case. ... Not once did Guerra ever ask for my advice or input about making policies, and I was never asked to make any type of decision ... as it pertains to how the DA's office ran. I didn't even have the discretion to determine which warrants to execute."
The district court identified these facts in determining that genuine disputes existed. The majority's rehashing of these factual issues on appeal goes to the genuineness of these disputes, rather than their materiality. See Johnson v. Jones , 515 U.S. 304, 314-15, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995). Accordingly, we lack jurisdiction *404 over this appeal, and the majority is wrong to conclude otherwise.
***
For these reasons, I respectfully dissent from reversal as to the claims of Dora Munoz, Chris Yates, Jorge Salazar, and Santos Leal.

Rodriguez also seeks appellate review of the court's denial of summary judgment on the official capacity claims against him under a theory of "pendent appellate jurisdiction." The official capacity claims, if pursued to judgment, would result in County liability. Because the County has no qualified immunity, however, the basis for interlocutory appellate jurisdiction is lacking.

Pickering v. Board of Education , 391 U.S. 563, 88 S. Ct. 1731, 20 L.Ed.2d 811 (1968) ; Connick v. Myers , 461 U.S. 138, 103 S. Ct. 1684, 75 L.Ed.2d 708 (1983).

Brady v. Fort Bend County , 145 F.3d 691, 696-97 (5th Cir. 1998) ; Click v. Copeland , 970 F.2d 106, 108 (5th Cir. 1992) ; Vojvodich , 48 F.3d at 882, 887.

As the district court observed in choosing not to decide whether the Plaintiffs in this case were policymakers, such a determination is "highly fact-intensive."

The district court explained Gunaca simply as a holding in favor of qualified immunity, in which the court did not reach the question of clearly established law. This is accurate, but the court should have understood the implications of the immunity decision for this case.

A recent district court decision referenced several factors in determining whether certain non-attorney positions in a DA's office required political loyalty. In that case, the defendant DA fired the Plaintiff who held the position of "Coordinator of the Crime Victims Unit." Garza v. Escobar , No. 7:18-CV-249, 386 F.Supp.3d 794, 799, 2019 WL 1930261, at *1 (S.D.T.X. 2019). The Plaintiff alleged First Amendment retaliation. Id . at 800-01, 2019 WL 1930261, at *2. The court considered whether the job was "well defined" or provided a "broad scope of responsibilities," whether the DA was "statutorily required to designate an individual for the Plaintiff's position," whether the Plaintiff was required to "work closely with government attorneys" and needed to handle "sensitive and confidential information and make[ ] discretionary decisions about that information," whether the Plaintiff's job required "communicating or serving as a liaison for the public," and whether the Plaintiff managed budgets, appropriated funds, or was in charge of securing funding. Id. at 809-11, 2019 WL 1930261, at *9-10. Examining these factors, the court ultimately concluded that political loyalty was an appropriate requirement for the plaintiff's position. Id. at 809, 2019 WL 1930261, at *9.

Dora Munoz submitted a copy of her job description which states that she exercised "executive management authority over all task force field operations personnel," "approve[d] all operational plans," and supervised HIDTA personnel. Yates also submitted his job description, showing that he "assume[d] all of the Commander's duties and responsibilities during the Commander's absence" and also exercised operational and supervisory authority.
The dissent insists that the statements in these job descriptions are disputed. But the fact is, the Plaintiffs submitted these job descriptions, along with declarations by Munoz and Yates stating that they are accurate.
Additionally, that the former District Attorney offered competing testimony on behalf of his political supporter-Plaintiffs does not detract from the importance of these management positions in the chain of command, or the new DA's intention, confirmed by Texas law, to rely on the HIDTA Commander and Assistant as employees from whom he expected wholehearted trust and loyalty. Moreover, to be consistent with Gunaca, we must afford this DA the same constitutional benefit of the doubt as was accorded the forerunner DA in Gunaca .

In Pearson v. Callahan , the Supreme Court clarified that courts need not initially decide whether the challenged action taken by a public official violated the constitution if the official was entitled to immunity because the law was not clearly established. 555 U.S. 223, 236, 129 S. Ct. 808, 818, 172 L.Ed.2d 565 (2009). Because the district court's analysis of clearly established law was flawed, we need not address Pickering - Connick balancing on the merits. See ids="3679212" index="94" url="https://cite.case.law/us/555/223/#p236">id.

Gunaca and Noyola do not categorically mandate qualified immunity in all Branti / Pickering / Connick cases; they are instead a reasonable prediction. See Kinney v. Weaver , 367 F.3d 337, 371 n.41 (5th Cir. 2004) (en banc) ("We do not think that this remark can be taken to set forth a rule of law to the effect that qualified immunity is mandated in Pickering cases.").

As the majority correctly points out, this Circuit has synthesized the third element's balancing test as follows: "Where nonpolicymaking, nonconfidential employees are discharged solely because of their private political views, little, if any weighing of an employee's First Amendment rights against an employer's right to loyal and efficient service is necessary, and the employee's rights will usually prevail. On the opposite end of the spectrum, however, are cases where employees' exercise of First Amendment privileges clearly over-balanced [their] usefulness." Gentry v. Lowndes County , 337 F.3d 481, 485-86 (5th Cir. 2003) (cleaned up).

See, e.g. , Brady v. Fort Bend County , 145 F.3d 691, 710 (5th Cir. 1998) (holding deputy sheriffs there "did not occupy positions for which political affiliation is an appropriate employment criterion" and "their political activity ... had little if any potential for undermining close working relationships within the sheriff's department or for impairing discipline by superiors or harmony among coworkers"); Click v. Copeland , 970 F.2d 106, 108 (5th Cir. 1992) (holding that while sheriff's office was required to engage in a balancing test to determine the legality of adverse employment actions against deputy sheriffs, "the balancing clearly tips in favor of the plaintiffs," such that the violation was clearly established); Vojvodich , 48 F.3d at 882, 887.

Indeed, the district court was careful to note that the first assistant DA "was candid in conceding that Plaintiffs did not have to support Rodriguez's campaign in order to do their jobs" and that the replacement HIDTA commander admitted that "it was not a requirement of his job that he give political allegiance to Rodriguez."

These sheriffs' office cases are also not distinguishable based on any purported distinction between sheriffs and district attorneys, as both are elected officials charged with heading up law enforcement bodies.